CLARENCE BURD, PLAINTIFF-APPELLANT, v. NEW JERSEY TELEPHONE COMPANY, A NEW JERSEY CORPORATION AND CONTINENTAL OIL COMPANY, A CORPORATION DOING BUSINESS IN NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued February 21 and 22, 1978—Decided May 23, 1978.

*Mr. John E. Patton* argued the cause for appellant (*Messrs. Gaccione and Pomaco,* attorneys).

*Mr. William P. Ries* argued the cause for respondent New Jersey Telephone Company (*Messrs. Purcell, Ries & Shannon,* attorneys).

*Mr. Arthur G. D'Alessandro* argued the cause for respondent Continental Oil Company.

The opinion of the Court was delivered by

CONFORD, P. J. A. D. (temporarily assigned). This appeal calls for further particularization of the rationale of the discovery rule in personal injury litigation as laid down in *Lopez v. Swyer,* 62 *N. J.* 267 (1973). The essence of the rule was there stated: " * * * in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Id.* at 272.

In this case plaintiff sustained a heart attack while gluing together lengths of pipe and laying them in an open trench. Plaintiff's contention is that the glue contained a gaseous substance, THF, which, under the particular circumstances in which he was working, was a causative factor in bringing about the heart attack. This tort action, following a workers' compensation proceeding against plaintiff's employer, was brought against the defendant telephone company, with which plaintiff's employer had contracted for laying the pipe, and defendant Continental Can Company, whose subsidiary produced the glue in question. After the trial court denied a motion for dismissal based upon the statute of limitations, a trial jury found for the plaintiff against both defendants in the sum of $100,000 damages. A motion for a new trial was denied, and defendants appealed to the Appellate Division.

The issue of limitations was based on defendants' contentions (a) that the cause of action accrued when the heart attack occurred, September 7, 1971, whereas the action was not instituted until May 16, 1974, more than two

years later; (b) in the alternative, assuming the validity of plaintiff's contention that he neither was nor should have been aware of the relationship of the glue being used in the trench to the heart attack until October 7, 1972, when his counsel received a medical report indicating the likelihood of such a link, nevertheless plaintiff had a reasonable opportunity to institute action prior to expiration of the normal two-year period after the injury.[1] Therefore the action was barred on limitation grounds on one or the other of these postulates. *N. J. S. A.* 2A:14–2.

The Appellate Division held plaintiff barred by limitations on the ground that, conceding plaintiff did not know of the connection between the presence of the glue and the heart attack, under all the circumstances plaintiff "should have known that he 'may have a basis for an actionable claim' " [quoting *Lopez*] on the date of the heart attack. 149 *N. J. Super.* at 34. We granted certification. 75 *N. J.* 21 (1977).

We concur in the result arrived at by the Appellate Division, but partly on the basis of express findings of fact made by the trial judge which we regard as adequately supported by the evidence but as inconsistent with the ultimate determination of the judge against the bar of limitations. Our conclusions require some rehearsal of the pertinent evidence. Some of the facts relevant to the discovery problem were recited in the Appellate Division opinion:

Plaintiff had been on this job for approximately one week at the time of his heart attack. He worked on a trench which was 5' deep and 18" wide. His job was to glue together the ends of pieces of plastic pipe, using the pipe and the glue supplied by New Jersey Telephone Company. He may also have done some shovelling and levelling.

The pipes were made of light plastic material and were 4" in diameter. Each section was 20' long and about 220' of pipe would be laid in an average day. The pipes were laid two across and eight

[1] The alternative basis of the defense has since been the subject of adjudication in *Fox v. Passaic General Hospital*, 71 *N. J.* 122 (1976). It plays no part in the determination of this appeal.

high. Thus, plaintiff would glue approximately 176 pipe connections daily. No ventilating equipment was provided for use in the trench.

The temperature was in the 80s on the day of plaintiff's heart attack and he was working in a direct sunlight, causing him to sweat profusely. Burd returned from his lunch break at about 12:30 P. M. but stopped working at 12:45 due to dizziness and pains in his upper torso. At 3:45 P.M. he was admitted to the hospital. The ultimate diagnosis was acute myocardial infarction with congestive heart failure.

\* \* \* \* \* \* \* \*

He had worked two prior jobs using the same solvent cement and had been using it for two days on this job prior to his heart attack. He would begin to feel dizzy about 1½ hours after commencing work with the glue. The dizziness would subside about one hour after he finished work.

\* \* \* \* \* \* \* \*

In response to a hypothetical question Dr. Kaplan concluded that plaintiff's exposure to an excessive concentration of THF was a substantial contributing factor to his heart attack. He conceded that his opinion was premised upon the assumptions that the concentration of THF was excessive and that plaintiff's blood pressure and hemoglobin count had fallen as a result of his exposure to it.

\* \* \* \* \* \* \* \*

It was stipulated that plaintiff first consulted an attorney shortly before the worker's compensation case was filed in May 1972. He was examined by Dr. Kaplan on August 21, 1972 for worker's compensation purposes. Plaintiff testified that he first learned of a possible link between the glue and his heart attack during a conversation which took place in October 1972 with his attorney in the compensation case. He further testified that he was not aware that the lightheadedness he had experienced on the job was caused by the glue.

\* \* \* \* \* \* \* \*

It is significant that plaintiff had the can of glue in his possession from five days prior to his heart attack until he turned it over to his present counsel in May 1974. The can contained a warning "Caution: \* \* \* Avoid inhaling fumes \* \* \*," and plaintiff concededly read this legend before he used it in the trench. In fact, plaintiff testified that if it had said "Danger," "toxic," or "adequate ventilation required" he would not have used it in the trench. While he was using the glue in the days just prior to his heart attack he felt dizzy, lightheaded, angry and mean. These symptoms cleared up within an hour or so after leaving his work.

149 *N. J. Super.* at 24, 25, 27, 28, 34.

In addition to the foregoing, we take notice of plaintiff's admission, upon confrontation during cross-examination

with prior testimony on depositions: " "* * * think back on the first day that you were on the Chester job gluing pipe on that particular day, did you experience dizziness or lightheadedness while you were using the glue', and you responded yes, meaning you did experience light headedness from using the glue." A. "I did." Moreover, when examined by Dr. Kaplan for the workers' compensation case, plaintiff told him, "I became dizzy and lightheaded while I was using the glue, gluing the pipe and putting the pipe together."

In arriving at his determination in favor of plaintiff on the limitations question, the trial judge said, pertinently:

> I believe he [plaintiff] *knew in his appraisal of his work employment that this material played some part in whatever occurred to him* but that does not necessarily mean that he knew he had a cause of action in that complex field of product liability that indeed he would instruct his barrister to go forth immediately.
>
> He was not his own solicitor.
>
> In this particular situation it is apparent that Mr. Domareki [plaintiff's compensation lawyer] as far as the product liability type situation amounted as a conduit of advice to Mr. Burd and that he was like a solicitor, he would see that the matter did get to the proper man to bring it before the court in a proper case.
>
> We will go back to what Mr. Burd knew or should have known. Would he know in the complex and ever-evolving field of products liability that he had a cause of action against a company in Oklahoma that had a branch in Connecticut? Would he know that? Would he know from the label that all he was supposed to do was to avoid inhaling? Did he know about the studies in Germany that occurred as far as the dogs were being affected and their cardiovascular system? Did he know all about this congress of hygienist adopting the standard of so many parts per million? Had he ever heard of the term of ppm?
>
> * * * * * * * *
>
> All of these things we approach I think from a realistic standpoint of standing at the edge of a jungle of possible legal rights, which one does he know or should have known? Which court should he go into? How should he go into it? How should he go about it? He hired a lawyer, Domareki, in the processing of the workmen's compensation case, and in the middle of the workmen's compensation case he finds that he may have a cause of action against the manufacturer of glue. Fine, Mr. Domareki, I rely upon you, Mr. Domareki.
>
> He said Mr. Burd was relying upon me. I called the shots up until Patton [plaintiff's lawyer in the present action] came into the pic-

ture, and from that time forward Patton and I called the shots. They both admitted quite candidly.

\* \* \* \* \* \* \* \*

Was he slumbering on his rights? He knew he had some rights but how they would come about and how they would be brought into play would be up to the lawyer upon which he relied.

Mr. Domareki said his expertise does not reveal the products liability in the field of products liability. He indicated he discussed this matter with Mr. Patton and turned it over to him who has some acquaintance with the field of products liability. (emphasis added)

██ We find the trial judge to have been in error in concluding that regardless of when a claimant knows or reasonably should know the *facts* of the relationship of his injury to a particular source or cause, the applicable limitations period does not begin running until he learns from a lawyer that those facts equate with a legal cause of action against the producer or originator of the injurious source or cause. It was not our intent, in the language from *Lopez* quoted at the head of this opinion, to hold that a claimant's time to sue, for limitations purposes, does not begin to run until he knows or is advised by a lawyer that facts of which he does, or should, reasonably have knowledge, give rise to a legal cause of action against a particular defendant. The statute of limitations necessarily imputes conclusively to a claimant knowledge that the law affords or may afford a cause of action on the basis of those facts of injury and causal relationship which in law do evoke a cause of action. In this regard it is of no consequence whether the cause of action arises in the field of products liability or any other aspect of tort law, or as to the degree of expertise which different lawyers possess in one such field or another. The discovery principle modifies the conventional limitations rule only to the extent of postponing the commencement of accrual of the cause of action until plaintiff learns, or reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action. There is no suggestion in any of the leading cases in this area that accrual of the cause of action is

292

postponed until plaintiff learns or should learn the state of the law positing a right of recovery upon the facts already known to or reasonably knowable by the plaintiff. See *Lopez v. Swyer, supra; Fox v. Passaic General Hospital, supra; Yerzy v. Levine,* 57 *N. J.* 234 (1970); *Fernandi v. Strully,* 35 *N. J.* 434 (1961).

When the reported decisions speak in terms of the "discovery of the existence of the cause of action," *e.g., Fox v. Passaic General Hospital, supra,* 71 *N. J.* at 124, the intended meaning is precisely what we have just articulated. That meaning was adumbrated by the formulation employed in both the *Yerzy* and *Lopez* cases, *supra, i.e.,* the cause of action accrues when "the injured party discovers * * * that he may have a *basis for* an actionable claim." (emphasis added) 62 *N. J.* at 272. The basis mentioned, is, of course, constituted solely by the material facts of the case.

 The legal misapprehension of the trial judge in the respects noted being thus established, we pass to his findings of fact in relation to the time of plaintiff's actual or imputable knowledge of the pertinent fact—the causal relation between plaintiff's exposure to the glue in the trench and the happening of the heart attack. The oral finding of the judge in this regard is by plain inference one that plaintiff possessed the critical knowledge at or about the time of the heart incident. "I believe he knew in his appraisal of his work employment that this material played some part in whatever occurred to him * * *." But that fact was regarded as not significant because, as stated in the remainder of the oral expression, plaintiff did not know he had a cause of action in the "complex field of product liability." The error inherent in the latter observation, as explained above, leaves plaintiff vulnerable to the preceding adverse finding of fact by the judge if that finding is fairly supportable on the record. We conclude that it is.

The regular incidence of lightheadedness and dizziness while using the glue, and the disappearance of the symptoms shortly after cessation of plaintiff's exposure thereto, together

with the permissible inference from the proofs that plaintiff realized the connection between the glue and the symptoms (although at trial he denied such knowledge), furnishes a substantial credible basis for an inference of knowledge by plaintiff at least shortly after the heart attack that the exposure to the fumes of the glue in the warm trench was in some way related to that attack. Notwithstanding that the judge might have found otherwise on the evidence, his finding that plaintiff knew that the "material played some part" in the attack cannot be faulted. And even if the language used by the judge could be argued to fall short of an express finding of actual knowledge by plaintiff of the causal connection, it would nevertheless at the very least constitute an adequate basis for a conclusion that plaintiff "by an exercise of reasonable diligence and intelligence" should have discovered the factual basis for whatever legal liability of the defendants underlay the judgment entered against them by the court. *Lopez v. Swyer, supra,* 62 *N. J.* at 272. The proofs need not evoke a finding that plaintiff knew for a certainty that the factual basis was present. It is enough that plaintiff had or should have discovered that he "may have" a basis for the claim. *Ibid.*

Since the critical time of the actual or constructive knowledge of the basis for the action possessed by or imputable to plaintiff, under the fact finding of the trial judge, must have been well before May 16, 1972 — a date two years prior to the institution of the action — plaintiff's cause of action is barred by the statute of limitations.

Judgment affirmed.

CLIFFORD, J., concurring. I vote to affirm the judgment below not only for the reasons contained in Judge Conford's opinion for the Court, in which I join, but also on the alternative grounds elucidated in the dissenting opinions in *Fox v. Passaic General Hospital,* 71 *N. J.* 122, 128 (1976), and *Moran v. Napolitano,* 71 *N. J.* 133, 142 (1976).

As pointed out by Judge Conford, *ante* at (287–288), the accident in question occurred on September 7, 1971, and plaintiff concedes that his counsel was aware of the relationship between the offending glue and his heart attack on October 7, 1972. There remained eleven months during which suit could have been filed before the expiration of two years from the accident date, more than ample time for the expeditious filing of a complaint. See *Moran, supra,* 71 *N. J.* at 142. Plaintiff having failed to institute suit in that time, I would hold his claim barred by the statute of limitations even if we were to accept his version of when the aforementioned causal connection was discovered.

Justice SCHREIBER joins in this concurring opinion.

PASHMAN, J., dissenting. The sole issue presented by this appeal concerns the proper application of the "discovery" rule to the facts of this case. In *Lopez v. Swyer,* 62 *N. J.* 267 (1973), we described the effect of that rule:

* * * a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.

[62 *N. J.* at 272]

Although I agree with the majority that the discovery rule is available to a plaintiff in a products liability action, I must dissent from its conclusion as to the date plaintiff's cause of action accrued for purposes of the statute of limitations.

The majority's opinion would be a correct statement of the law if plaintiff was seeking damages for the dizziness caused by the inhalation of the solvent glue fumes, as plaintiff is undeniably chargeable with knowledge that he experienced dizziness and light-headedness as a regular concomitant of his exposure to those fumes. However, the basis of plaintiff's suit is that the glue was the causative agent not of his dizziness but of the heart attacks he suffered on September 7 and

October 12, 1971. The record reveals that plaintiff did not actually learn of the possible causal relationship between the glue and his two heart attacks until early October 1972, when he was so informed by his attorney, who had received a report to that effect from a medical expert. We are thus called upon to determine whether plaintiff is fairly chargeable with the constructive knowledge of that material fact, the final ingredient necessary to provide the "basis for an actionable claim," at some earlier point in time which would bar his suit, instituted in May 1974, as untimely.

There is no question as to plaintiff's equitable entitlement to the benefit of the discovery rule. *Lopez v. Swyer, supra,* 62 *N. J.* at 275–276. The only issue is pinpointing the time of discovery within the meaning of the rule in order to ascertain whether suit was instituted within two years thereafter. This case falls into the same category as *Lopez,* where the "damage may be all too apparent, but the injured party may not know that it is attributable to the fault or neglect of another." 62 *N. J.* at 274. The majority affirms the result reached by the Appellate Division but does so on a different basis, without approving the troublesome implications of the opinion below. Two alternative rationales are offered for the result reached. In one view, a statement by the trial judge that the plaintiff knew that the glue "played some part in whatever occurred to him" is taken as a finding of fact that plaintiff had actual knowledge, "at least shortly after the heart attack," of the causal connection between the glue fumes and his misfortune. Record support for this finding is found in plaintiff's awareness of the correlation between the use of the glue and the incidence of dizziness and lightheadedness and in the disappearance of these "symptoms" within a short time after plaintiff stopped working with the glue each day. These facts are said to provide a basis for the ultimate inference that "plaintiff realized the connection between the glue and the symptoms." See *ante* at 293. Alternatively, if the judge's statement did not constitute a finding of actual knowledge, the majority finds in his words a

valid basis for the legal conclusion that constructive knowledge of the causal relationship is properly imputable to plaintiff. I believe the majority grievously errs in adopting either theory.

The circumstances of this case must be recounted in order to understand the extent to which the majority's position is inconsistent with common sense and simple justice. Plaintiff is an unskilled laborer with an eighth-grade education. He was 51 years old at the time of his injury and had performed physical labor for his entire working life. Prior to his heart attacks, plaintiff was suffering from arteriosclerosis, pulmonary fibrosis and chronic lung diseases and was a heavy smoker. His medical expert testified that plaintiff might very well have had the heart attacks even in the absence of any exposure to the fumes. He also testified that it was more likely for someone of plaintiff's age with arteriosclerosis who had been performing physical labor on a hot day to experience dizziness than a worker without arteriosclerosis. Plaintiff had been working for several hours outdoors in a confined space unprotected from the bright sun on a hot humid day in late summer. He had been using the glue on the two previous days at the same job and had used it on two prior jobs without incident. He knew that inhaling the glue's fumes "wasn't too good" for him and affected his mood as well as making him dizzy and light-headed after constant exposure. He read the label on the glue's container and noted the absence of any warning concerning the hazard of inhalation. He believed, not unreasonably, that working with the glue outdoors in fresh air would eliminate any potential danger. Plaintiff suffered a second heart attack more than a month later without any further exposure to the glue.

From this plethora of potential precipitating factors, the majority concludes that the plaintiff should have been able to deduce that his heart attacks were the result of his inhalation of the glue's fumes. He is charged not only with that knowledge but also with the ability to disregard, as medically irrelevant, any other possible causes of his

affliction, such as overexertion, aggravation of a preexisting condition, age or other natural causes. Plaintiff is expected to possess sufficient expertise to know that his heart attacks were medically attributable to his exposure to the glue fumes on pain of being denied his day in court if he is in fact ignorant. The repugnance of this position to the equitable spirit of *Lopez v. Swyer* is obvious.

Plaintiff was only aware of the coincidence between his use of the glue and his experience of dizziness and light-headedness. While these conditions are in many cases precursors of an imminent heart attack, the correlation is not so strong that dizziness and light-headedness can be said to be heart attack "symptoms" or to point inevitably to an eventual heart attack from continued exposure to the substance which causes the dizziness and light-headedness. The majority makes an intuitive leap from an actual awareness that dizziness is attributable to the glue fumes to an imputed awareness that myocardial infarctions are similarly attributable. However medically accurate this conclusion might be, to presume that this unsophisticated layman is capable of making a self-diagnosis of the effect of the glue on his cardiovascular system, a diagnosis whose complexity is demonstrated by the dispute over causation between the medical experts at trial, is plainly inconsistent with reality.

Simply stated, from the plaintiff's point of view, the fact that the glue might be capable of inducing dizziness does not establish that it is capable of causing a heart attack. Any suspicions the plaintiff might have had on the latter score were no doubt dissipated when he had his second heart attack a month later, after having had no further exposure to the glue. Certainly to a layman that occurrence could be reasonably understood to negate any possibility that the first heart attack was externally caused. In view of the multiplicity of possible causes for his first heart attack and the apparent non-involvement of the glue in his second, I cannot say that it was unreasonable for this plaintiff to fail to perceive the prominence of the glue as

the likely cause of his injury. Plaintiff is not an occupational disease specialist and cannot fairly be treated by this Court as if he were. Only if he was such an expert could he have discovered that he "may have" had a cause of action attributable to the glue. The evidence in this case supports neither a finding of actual knowledge nor a conclusion of constructive knowledge with respect to the causation of plaintiff's injuries.

Although its holding is confined to the peculiar facts of this particular case, the majority's position does violence to the equitable underpinnings of the discovery rule. Constructive discovery may be found only where the injured person is able to learn of his potential cause of action through the exercise of "reasonable diligence and intelligence." To be consistent with the remedial purposes of the discovery rule, reasonableness in this regard must be more a subjective than an objective standard. Although I do not believe the result reached by the majority would be sustainable even if plaintiff was a college-educated professional, it is totally untenable with respect to a person with an eighth-grade education. How can such a plaintiff be capable of making a medically competent judgment as to the cause of the plight which had befallen him? The harshness of the result in such circumstances is contrary to this Court's traditional sensitivity to the concerns of equity and justice in applying the discovery rule.

I am further alarmed by the majority's *sub silentio* implication that persons in plaintiff's situation are under some sort of duty to consult promptly with a medical expert in order to verify the factual basis of a potential lawsuit whenever they have the slightest inkling that whatever is wrong with them could have more than one cause. Under the majority's rule the statute of limitations is triggered whenever a plaintiff fails to connect his injury to a potential defendant, even though a knowledgable expert's opinion might be necessary to correct the plaintiff's initial misimpression of the cause of his injury. The majority's position

in this regard assumes a consciousness of potential litigation that is unrealistic even in the litigious society we live in today and will, on pain of forfeiture, force persons to act with excessive caution to safeguard their legal rights.

In my view, plaintiff cannot be held to have discovered the existence of his potential cause of action against the glue manufacturer until he learned, in October 1972, of the possible causal link between the inhalation of the glue fumes and his heart attacks. He could not, through the exercise of reasonable intelligence, have discovered the causal relationship essential to the perfection of his cause of action against the glue manufacturer prior to that time. I accordingly would reverse the judgment of the Appellate Division and reinstate the jury's verdict.

Chief Justice HUGHES and Justice HANDLER join me in this opinion.

· HANDLER, J., dissenting. I disagree with the result reached by the Court that when plaintiff, an unskilled laborer with an eighth grade education, suffered successive heart attacks he had knowledge that he might have a basis for an actionable claim attributable to his inhalation of fumes from a glue he used in connection with his physical labor. I am particularly perturbed because the majority has strained unnaturally and unfairly to foreclose a legitimate cause of action in favor of plaintiff.

In arriving at this result, the majority relies on the following language of the trial judge:

> I believe he knew in his appraisal of his work employment that this material [the solvent] played some part in whatever occurred to him but that does not necessarily mean that he knew he had a cause of action in that complex field of product liability that indeed he would instruct his barrister to go forth immediately.
>
> [*Ante* at 290].

The statement of the trial judge that the glue "played some part in whatever occurred" to plaintiff is vague and

ambiguous. Nevertheless, this imprecise and uncertain statement is metamorphosed by the majority into a definitive determination that plaintiff, exercising reasonable diligence, actually knew, or should have known, that the solvent was a substantial contributing factor in his heart attacks.

This attenuated construction of the trial court's language is further exposed by the majority's chimerical search of the record to find evidential support therefor. The opinion states:

> The regular incidence of lightheadedness and dizziness while using the glue, and the disappearance of the symptoms shortly after cessation of plaintiff's exposure thereto, *together with the permissible inference* from the proofs that plaintiff realized the connection between the glue and the symptoms (although at trial he denied such knowledge), furnishes a substantial credible basis for *an inference of knowledge* by plaintiff at least shortly after the heart attack that the exposure to the fumes of the glue in the warm trench was in some way related to that attack.
>
> [*Ante* at 292–293]. [Emphasis added].

In every other context, we decry the process by which successive inferences are compounded to generate ultimate conclusions. Yet, here, this Court is endorsing baldly such reasoning to bolster its conclusions that this plaintiff had adequate knowledge that the glue contributed to his heart attacks and that the trial court specifically so found. Indeed, examining carefully the majority's position, the most that it encompasses is that plaintiff experienced dizziness juxtaposed with his use of the glue and that he had a realization that these two phenomena were correlated. According to the majority, this was sufficient to charge plaintiff with knowledge that the solvent "was in some way related to that attack," (*Ante* at 293), even though this proposition rests solely upon an inference not even drawn by the fact-finder.

It is perplexing that the majority can leapfrog to this conclusion. It acknowledges that the *only* evidence available is plaintiff's testimony that "I used to get dizzy and light-

headed every day just before I got out of the ditch [after using the solvent] and then about an hour afterwards I was good." This testimony of plaintiff can hardly be equated with knowledge, or even intuition, surmise or speculation, that the glue contributed to the heart attacks. It must be pointed out that, although plaintiff said he suspected that "inhaling them [the glue] wasn't too good, I had to live and I had to work," he did not believe it was unsafe, saying further "* * * I figure you are outside, you won't get it, it won't be hazardous to you." Under these circumstances, the majority's attitude toward this plaintiff—that plaintiff's dizziness when he used the glue, *ipso facto,* justified a finding of knowledge of causation of his heart attacks—is inexplicably harsh. As demonstrated by Justice Pashman in his dissenting opinion, the symptom of dizziness exhibited itself in a different area of the anatomy than the heart; more importantly, it was not a classic symptom of a heart attack, such as shortness of breath, chest pains or indigestion. To charge plaintiff, a 51 year old, unsophisticated manual laborer, with knowledge of causation on this slender reed is not right.

The Court singles out appropriately a fundamental mis-apprehension on the part of the trial judge. The trial court concluded that "the applicable limitations period does not begin running until he [plaintiff] learns from a lawyer that those facts equate with a legal cause of action against the producer or originator of the injurious source or cause." *Ante* at 291. The majority is correct if it means that the inquiry of the trial judge was misguided in that he failed to perceive that the discovery rule postpones the commence-ment of the accrual of a cause of action until a plaintiff discovers, or should have discovered with reasonable dili-gence, the causative connection between the operative facts and the damages he suffered, not until he secures knowledge, in fact, that he has a viable cause of action in tort against a putative wrongdoer.

The Court in this opinion seems to be going much further than merely remonstrating with the trial court for its misstatement of the applicable standard governing the discovery rule. The majority has itself, perhaps inadvertently, miscast the proper rule. To iterate, the opinion states that plaintiff is not entitled to invoke the discovery rule to toll the statute of limitations because plaintiff knew that the glue "was in some way related to that [heart] attack." *Ante* at 293. Even if the solvent was "in some [wholly unspecified] way related" to plaintiff's heart attacks, this is *not* the test to apply with respect to the application *vel non* of the discovery rule. The majority's conclusory statement falls short of a determination that plaintiff had knowledge of the causative connection between the glue and the myocardial infarctions, *i. e.*, that he "may have" a basis for a claim. *Lopez v. Swyer*, 62 *N. J.* 267, 272 (1973).

Indeed, no case explicating the equitable doctrine, which we call the discovery rule, has used the amoebic phraseology of the majority opinion. Compare the majority's restatement of the test, *Ante* at 293 ("in some way related") with *Fox v. Passaic General Hospital*, 71 *N. J.* 122, 124 (1976) ("discovers the existence of a malpractice cause of action") ; *Moran v. Napolitano*, 71 *N. J.* 133, 134 (1976) (discussing *Fox*) ("plaintiff discovers his cause of action") ; *Lopez v. Swyer*, *supra*, 62 *N. J.* at 272, 274 ("party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim") ("knows or has reason to know that he has a right of redress") ; *Farrell v. Votator Div. of Chemetron Corp.*, 62 *N. J.* 111, 115 (1973) ("plaintiff does not know or have reason to know that he has a cause of action against an identifiable defendant") ; *Yerzy v. Levine*, 57 *N. J.* 234, 235 (1970), aff'g as mod. 108 *N. J. Super.* 222 (App. Div. 1970) ("knew or had reason to know that plaintiff might have a basis for a claim") ; *Diamond v. New Jersey Bell Tel. Co.*, 51 *N. J.* 594, 597 (1968) ("knows or should reasonably know of his

injury"); *New Market Poultry Farms, Inc., v. Fellows*, 51 *N. J.* 419, 424 (1968) ("knew or had reason to know that he had a cause of action arising from the suffering of actual damage"); *Fernandi v. Strully*, 35 *N. J.* 434, 438, 441 (1961) ("knows or has reason to know that he has a cause of action") ("know or have any reason to know that he has a cause of action"). Thus, all the cases which have endeavored to articulate the test focus upon the conceptual principle at the core of the discovery rule, namely, actual or constructive knowledge that there is a distinct possibility that plaintiff may have grounds for an action in tort.

I strongly fear that, although the majority purports to deal with this case solely upon a factual basis and professes to disclaim any intent to retreat and retrench from the salutory development of the discovery rule, the opinion of the Court has significantly loosened the test for tolling the statute of limitations and may constitute a regressive step in the law of torts.

The majority has struggled unsuccessfully to show that the tolling of the statute of limitations was improper in this case. I do not see how that conclusion, on any factual or legal thesis, can be sustained. There was no determination by the trial judge that the invidious solvent was known, actually or constructively, by plaintiff to have caused his successive heart attacks. Moreover, there is no factual support in the record for imputing such knowledge to plaintiff as an ultimate conclusion of fact.

Furthermore, again as aptly presented by Justice Pashman in dissent, other circumstances surrounding the injury negative any sound basis for concluding that plaintiff had knowledge of the causal correlation between his heart attacks and the glue. September 7, 1971, the date of the first heart attack, was a hot, humid day; the temperature was between 80–85 degrees. Plaintiff, a life-time physical laborer, worked directly in the sun; he engaged in strenuous physical activity, gluing together pipes which were 20′ long and 4″ in diameter. Plaintiff suffered from arteriosclerosis, pulmonary fibrosis

and chronic lung diseases; he was a heavy smoker. In addition, plaintiff suffered a second heart attack on October 12, 1971, more than a month after his last exposure to the glue.

It is apparent that plaintiff did not discover, nor could he have discovered through the exercise of due diligence, the causative link between the inhalation of the noxious vapors and his heart attacks until October 1972, when his attorney apprised him of the substance of the doctor's report. Since plaintiff instituted his cause of action within two years from that date, his action was timely filed unless (1) defendant was "peculiarly or unusually prejudiced" by the lapse of time between expiration of the statute of limitations and the date of institution of the suit, and (2) there was a reasonable time for plaintiff to institute his actions between discovery of the cause of action and expiration of the statute of limitations. *Fox v. Passaic General Hospital, supra.* There is not a scintilla of evidence in the record that defendant has been prejudiced by the lapse of time between September 7, 1973 and May 16, 1974, let alone "peculiarly or unusually prejudiced."

Accordingly, I would reverse the judgment of the Appellate Division and reinstate the jury's verdict.

Justice PASHMAN joins in this opinion.

*For affirmance*—Justices SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—4.

*For reversal*—Chief Justice HUGHES and Justices PASHMAN and HANDLER—3.