775 A.2d 700 (2001)
342 N.J. Super. 38
William VILLALOBOS, Plaintiff-Appellant,
v.
Ronald S. FAVA, individually and in his official capacity as Passaic County Prosecutor, Robert Warmington, individually and in his official capacity as First Assistant Prosecutor, John Nativo, individually and in his official capacity as Chief of Investigators for the Passaic County Prosecutor's Office, and The County of Passaic, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 2000.
Decided July 3, 2001.
*701 Richard J. Simon, New Brunswick, argued the cause for appellant.
Cynthia M. Jacob, Somerset, argued the cause for respondent (Collier, Jacob & Mills, attorneys; Ms. Jacob, of counsel and on the brief).
Before Judges STERN, RODRÍGUEZ and COLLESTER.
The opinion of the court was delivered by COLLESTER, J.A.D.
Plaintiff William Villalobos appeals from an order of summary judgment resulting in the dismissal of his case against defendants, based on the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8 (CEPA). We affirm.
Plaintiff was employed as a county investigator and detective with the Passaic County Prosecutor's Office from 1976 to 1994. In August 1984, he was promoted to the position of Captain of County Detectives and was assigned supervision of the Passaic County Prosecutor's Narcotics Unit. In November 1992, he was made supervisor of the Government Corruption *702 and White Collar Crime Unit, and he was later transferred to supervisor of the Auto Thefts Task Force on March 16, 1994. Neither transfer involved any demotion in rank, salary or title. On August 1, 1994, plaintiff resigned on pension from the Passaic County Prosecutor's Office. He filed suit on December 29, 1998, against Ronald S. Fava, the Passaic County Prosecutor, Robert Warmington, the former First Assistant Prosecutor, John Nativo, Chief Investigator of the Prosecutor's Office, and the County of Passaic.
The circumstances giving rise to plaintiff's complaint relate back to September 1992, when plaintiff was supervisor of the Narcotics Unit. Lieutenant James Bush, a county investigator assigned to the Narcotics Unit, informed plaintiff that he had received information that illegal narcotics sales were being conducted at Bojangles All American Bar and Grill (Bojangles) in Wayne. He further told plaintiff that Vincent Mochetta, a lieutenant in the Prosecutor's Office, had a financial interest in Bojangles together with Peter Realmonte, a target of the investigation, who had been the subject of a federal indictment for conspiracy to distribute cocaine.
On October 14, 1992, Bush informed Prosecutor Fava of the Bojangles investigation as well as Mochetta's involvement with Realmonte. After having been assured that Mochetta was not a target or suspect of the investigation, Fava told Bush to advise Mochetta of the Bojangles investigation. When plaintiff learned of this instruction to Bush, he expressed to Fava his "strong opposition" to informing Mochetta. He advised Fava to refer the investigation to the Division of Criminal Justice of the Office of the Attorney General.
Two days later Fava ordered Warmington and Nativo to direct plaintiff to thoroughly brief Mochetta on the Bojangles investigation including the disclosure of confidential informants and undercover officers. Plaintiff complied with the order, but he submitted a memorandum to Fava on November 2, 1992, memorializing his objections to informing Mochetta and again recommending that the matter be referred to the Attorney General. Three days later Fava and Warmington had a three hour meeting with plaintiff during which time they told him that his memorandum should never have been written and filed because it challenged the authority of the prosecutor and implied that his decision in the matter was improper. After that meeting, plaintiff and Bush separately notified the Attorney General's Office of the Bojangles matter.
Less than two weeks after his confrontational meeting with Fava, plaintiff was transferred from the Narcotics Unit to the Government Corruption and White Collar Crime Unit. Mochetta was promoted to the rank of Captain and replaced plaintiff as supervisor of the Narcotics Unit. Plaintiff certified that Fava told him that the decisions were made "in the best interest of the Prosecutor's Office" and that Mochetta's promotion and assignment to the Narcotics Unit was decided prior to the Bojangles investigation.
On March 16, 1994, plaintiff was again transferred, this time to the position of supervisor of the Auto Theft Task Force. He was told this time by Chief Nativo that the transfer was "for the good of the Prosecutor's Office." Six months later, on August 1, 1994, plaintiff resigned from the Passaic County Prosecutor's Office.
Plaintiff was entitled to civil service protection and thereby not subject to at will termination by the Prosecutor under N.J.S.A. 2A:157-10. However, Bush had no civil service protection, and on June 30, 1995, Fava terminated Bush's employment. On June 18, 1996, Bush filed his civil complaint *703 against these same defendants, alleging that his termination was a retaliatory discharge directly related to his report of the Bojangles matter to the Attorney General's Office and was a violation of CEPA. He claimed that Fava had retaliated against him earlier by removing him from the Narcotics Unit and assigning him to the Court Squad as a punitive action. He alleged that Fava delayed terminating him so that he could mask the retaliatory firing as a discretionary decision of the Prosecutor not to reappoint under N.J.S.A. 2A: 157-10.
Bush's lawsuit received considerable publicity, particularly in Passaic and Bergen counties, and more press attention resulted when Warmington filed a cross-claim against Fava alleging that he was wrongfully terminated from his position as First Assistant Prosecutor in August 1995, in retaliation for objecting to Fava's decisions in the Bojangles matter including his decision to fire Bush. Subsequent press accounts revealed that documents of the Narcotics Unit relating to the Bojangles investigation were subpoenaed by a State Grand Jury and that a confidential letter had been sent to Fava from the Director of Criminal Justice finding no evidence of criminal conduct with respect to the investigation, but critical of the decision not to refer the matter and stating that placing Mochetta in charge of the investigation "clearly raised issues of potential conflict" and had "the appearance of impropriety."
Plaintiff was aware of Bush's lawsuit and the attendant publicity, including being mentioned in some articles indicating his opposition to Fava on the Bojangles matter. Nonetheless, he alleges that he was unaware of the harm perpetrated against him in violation of CEPA until January 4, 1998, when Bush told him of his favorable settlement with reinstatement, back pay and payment of legal fees. Plaintiff certified that it was at this time that Bush told him that discovery materials in his lawsuit disclosed a conspiracy by defendants to retaliate against plaintiff for his actions in the Bojangles matter by giving him "degrading assignments and transfers" in order to force him into retirement.
Bush's comments referred to Warmington's answers to interrogatories in the Bush suit which included the following statements:
Fava ... stated to Warmington alone, and to Warmington and Nativo together, on more than one occasion, that he would force Captain Villalobos out of the Prosecutor's Office via degrading re-assignments since Villalobos had civil service protection and was not subject to reappointment.
....
I distinctly recall the Prosecutor coming into my office with the memorandum in hand. He was enraged that Villalobos had sent the memorandum. He viewed it as an attempt to contravene his orders and to back him into a corner.
I could not understand the Prosecutor's reaction. I viewed the memorandum as reasonable and logical and an attempt by Villalobos to protect the Prosecutor from judgmental errors which would come back to haunt the Prosecutor. It's suggestion that the investigation be referred to the Attorney General's Office was consistent with the advice I had been giving to the Prosecutor in private.
There was, however, no reasoning with the Prosecutor. He was incensed, and stated to the effect that he would take care of all involved.
....
I recall that the Prosecutor transferred Villalobos out of the Narcotics Unit as a punitive action for his role in *704 the Bojangles investigation and later re-assigned him to an automotive squad position, also as a punitive action.
Plaintiff certifies that it was only at this time that he became aware of a conspiracy to force him to retire by retaliatory transfers to undesirable assignments. He asserts that until that time he accepted at face value the statements of Fava and Navito that the transfers were "for the good of the Prosecutor's Office."
Plaintiff filed his CEPA complaint on December 29, 1998, more than six years after his first transfer and more than four years after his resignation. Defendants moved for summary judgment on CEPA's one year statute of limitation, N.J.S.A. 34:19-5. Judge Cramp granted the motion, holding that (1) the "discovery rule" did not extend to the one year statute of limitations under CEPA; (2) even if the rule was applicable to CEPA actions, plaintiff was not protected by the rule; and (3) plaintiff was not entitled to equitable tolling of the one year limitation period.
Commonly called the "whistleblower statute," CEPA provides as follows:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. [d]iscloses or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law ...;
b. [p]rovides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer, with whom there is a business relationship...; or
c. [o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]
Any claims brought pursuant to the CEPA must be filed within one year of "a violation of any of the provisions of this act." N.J.S.A. 34:19-5. See Beck v. Tribert, 312 N.J.Super. 335, 346, 711 A.2d 951 (App.Div.), certif. denied, 156 N.J. 424, 719 A.2d 1022 (1998). As such, plaintiff's cause of action under CEPA is barred by the one year limitation period absent the tolling of the statute. Plaintiff argues that tolling is appropriate under the discovery rule and, alternatively, that there should be an equitable tolling based on the defendant's alleged secretive and conspiratorial actions.
There is a significant distinction between the two equitable doctrines affording relief from unfair and unnecessarily harsh results. The discovery rule avoids the mechanical application of a statute of limitations by postponing the accrual of a cause of action so long as a party is unaware either that he has been injured or that the injury was due to the fault or neglect of an identifiable person. Equitable tolling assumes the accrual of the action but intercepts and delays the bar of the statute of limitations because the plaintiff lacked vital information which was withheld by a defendant.
*705 The discovery rule evolved from medical malpractice and product liability cases. See, e.g., Fernandi v. Strully, 35 N.J. 434, 173 A.2d 277 (1961)(foreign body left by surgeon in patient's abdomen discovered two years later); Graves v. Church & Dwight Co., Inc., 115 N.J. 256, 558 A.2d 463 (1989)(plaintiff discovered cause of rupture in stomach wall due to baking soda four years after injury occurred). The substance of the rule was stated as follows in Lopez v. Swyer, 62 N.J. 267, 272, 300 A.2d 563 (1973), "in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim."
The discovery rule applies to the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3. Beauchamp v. Amedio, 164 N.J. 111, 117, 751 A.2d 1047 (2000); Lamb v. Global Landfill, 111 N.J. 134, 144-45, 543 A.2d 443 (1988); Ayers v. Jackson Twp., 106 N.J. 557, 582, 525 A.2d 287 (1987); Caravaggio v. D'Agostini, 166 N.J. 237, 245, 765 A.2d 182 (2001); Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426-27, 527 A.2d 66 (1987). More recent applications of the rule as applied to medical malpractice are contained in Caravaggio v. D'Agostini, 166 N.J. 237, 245, 765 A.2d 182 (2001); Martinez v. Cooper Hospital-University, 163 N.J. 45, 747 A.2d 266 (2000). The rule is not restricted to instances of bodily injury. See New Mkt. Poultry Farms, Inc. v. Fellows, 51 N.J. 419, 241 A.2d 633 (1968)(miscalculation of acreage by surveyor); Diamond v. N.J. Bell Tel. Co., 51 N.J. 594, 242 A.2d 622 (1968)(negligent damage to a sewer line). However, its use has been restricted to accrual statutes of limitation which allow for tolling.
In Fernandi, supra, 35 N.J. 434, 173 A.2d 277, which first applied the discovery rule to a medical malpractice action in which the limitation period was "two years next after the cause of any such action shall have accrued," N.J.S.A. 2A:14-2, it was held that the period of limitation of action began to run only after the plaintiff knew or had reason to know that a foreign object had been negligently left in her abdomen following surgery. Notably the adoption of the discovery rule upon "the absence of legislative definition and specification." Fernandi, supra, 35 N.J. at 449, 173 A.2d 277.
Similarly, in Brookins v. Murray, 131 N.J. 141, 619 A.2d 583 (1993) the Supreme Court rejected plaintiff's contention that the ninety day time period for filing claims under the Unsatisfied Claim and Judgment Fund should be tolled until a claimant discovered that the responsible party was uninsured on the basis that the legislature had restricted relaxation of the time provision to specified exemptions. See also Presslaff v. Robins, 168 N.J.Super. 543, 403 A.2d 939 (App.Div.1979)(holding the discovery rule inapplicable to the limitation period for filing an action under the Wrongful Death Act in the absence of statutory language to support its application); Schwarz v. Fed. Shipbldg. & Dry Dock Co., 16 N.J. 243, 251, 108 A.2d 417 (1954)(rejecting proposed application of discovery rule to Workers' Compensation Law because "this court cannot read something into a statute that is not there"); Interlox Punch & Die Corp. v. Insilco Corp., 174 N.J.Super. 175, 415 A.2d 1208 (Law Div.1980)(declaring discovery rule not applicable to an action for fraud under the New Jersey Uniform Securities Act because the legislature did not include "accrual" language in the statute).
Plaintiff relies on Keelan v. Bell Commun. Research, 289 N.J.Super. 531, 674 A.2d 603 (App.Div.1996), for his contention that the discovery rule is applicable to the CEPA one year period of limitation. In *706 that case the plaintiff filed a CEPA complaint alleging retaliatory termination. He received notification on September 23, 1992, that his employment would be terminated on December 2, 1992 and initiated his lawsuit on November 30, 1993. Noting that CEPA is remedial legislation and as such must be liberally construed, we adopted the date of actual termination rather than the date of notification as the date of termination for the CEPA one year limitation period on the ground that an employer could alter a decision up to the time of discharge. Id. at 540, 674 A.2d 603. Contrary to plaintiff's position, we did not hold that the discovery rule was applicable to the CEPA statute of limitations but rather that the starting date runs from the effective date of the retaliatory action, defined by the statute as the date of "discharge, suspension or demotion." N.J.S.A. 34:19-2(e).
Recently in Alderiso v. Med. Ctr. of Ocean County, 167 N.J. 191, 770 A.2d 275 (2001) the Supreme Court held that when the alleged employer conduct is wrongful termination, the CEPA cause of action accrues on the date of actual discharge, which is defined as the last day for which the employee is paid. The retrospective holding was that the date after discharge as so defined was the first day for computation purposes under CEPA's one year statute. In another recent opinion we held that in a constructive termination case the action accrued on the date the plaintiff tendered resignation rather than the last date of employment. Daniels v. Mut. Life Ins. Co., 340 N.J.Super. 11, 773 A.2d 718 (App.Div.2001).
In no instance has it been held that the discovery rule is applicable to CEPA, and the statute is barren of any language suggesting its application. However, even if the rule were applicable, plaintiff Would have to show that he could not through reasonable diligence and intelligence have discovered a basis for his claim within a year of filing his complaint. Lapka v. Porter Hayden Co., 162 N.J. 545, 556, 745 A.2d 525 (2000); Burd v. N.J. Tel. Co., 76 N.J. 284, 291-292, 386 A.2d 1310 (1978). Here plaintiff knew at the outset that Fava rejected his suggestions that Mochetta not be told of the Bojangles investigation and that the prosecutor refer the entire matter to the Attorney General. When plaintiff later filed a memorandum setting forth his disagreement with the Prosecutor's position, he was upbraided by Fava and Warmington in a three hour confrontational meeting and told his actions were improper and disrespectful. Plaintiff advised the Attorney General of the matter with full knowledge that this action met with the disapproval of Fava. It was less than two weeks after the meeting with Fava and Warmington that plaintiff was transferred against his wishes to the White Collar Crime Unit and then sixteen months later to the Auto Theft Unit.
Plaintiff was employed in law enforcement for thirty years and for over twenty in the Passaic County Prosecutor's Office. It strains credulity that this veteran detective accepted what he believed to be demotions in prestige and authority without suspecting that he suffered the slings and arrows of an outraged prosecutor. It is even more unlikely that he did not harbor a reasonable belief that he had been victimized by retaliation at the time he resigned in 1994.
Bush's firing a year later and his subsequent CEPA action claiming retaliation against him because of the Bojangles incident did not escape plaintiff's attention. Neither did Warmington's charges that he too had suffered a retaliatory firing because of his opposition to the prosecutor's actions in the Bojangles matter. Plaintiff's assertion that even at this late date he still *707 believed that his transfers were "for the good of the office" and not retaliation similar to that claimed by Bush and Warmington is an expression of naivete which is hard to accept. Even more puzzling is the failure of plaintiff to make any inquiry of Bush or Warmington until the Bush case was settled, which was six years after plaintiff's first transfer and four years after his resignation.
A plaintiff need not know with certainty that there is a factual basis for a claim under CEPA for the one year limitation period to be triggered; it is sufficient that he should have discovered that he may have a basis for a claim. Lapka, supra, 162 N.J. at 556, 745 A.2d 525; Burd, supra, 76 N.J. at 293, 386 A.2d 1310. In this instance, the factual assertions put forth by both sides demonstrate that plaintiff should have discerned a basis for a CEPA claim long before his January 1998 conversation with Bush.
An employee's CEPA claim accrues on the date of his actual demotion, suspension or termination of employment. Alderiso, supra, 167 N.J. at 194-95, 770 A.2d 275; Keelan, supra, 289 N.J.Super. at 539, 674 A.2d 603; Daniels, supra, 340 N.J.Super. 11, 773 A.2d 718. Plaintiff's argument that the statute did not accrue until he was told of the "conspiracy" six years after his alleged retaliatory transfer tilts the balance between the remedial purpose of CEPA and the need for prompt resolution of CEPA claims. It is also inconsistent with a common sense view of the factual assertions in this case. Accepting the premise that the transfers of plaintiff were intended to force his resignation, we hold that the effective date of accrual was the date of his resignation, more than four years prior to the commencement of this action and thereby barred by N.J.S.A. 34:19-5.
Plaintiff's argument that the conduct of defendants warranted an equitable tolling of the limitation period is also unpersuasive. Unlike the discovery rule which suspends the limitation period because the plaintiff is unaware of retaliatory action, equitable tolling of a statute of limitations occurs when a plaintiff is misled as to the real reason for demotion or termination and as a result fails to act within the prescribed time limit. Dunn v. Borough of Mountainside, 301 N.J.Super. 262, 276-78, 693 A.2d 1248 (App.Div.), certif. denied, 153 N.J. 402, 709 A.2d 795 (1998); Friedman v. Friendly Ice Cream Co., 133 N.J.Super. 333, 336 A.2d 493 (App.Div. 1975); see generally, Pressler, Current N.J. Court Rules, (Gann 2000) Comment 33.4 on R. 4:5-4 at 1186-87. Typically the doctrine is applied "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Dunn, supra, 301 N.J.Super. at 280, 693 A.2d 1248 (quoting Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 96, 111 S.Ct. 453, 458, 112 L.Ed.2d 435, 444 (1990)); see also Davis v. Frapolly, 742 F.Supp. 971, 975 (N.D.Ill.1990).
In Dunn we found that the failure to perform an independent duty could result in an equitable tolling. The plaintiff had been seriously abused by a police officer but was unable to make an identification of the defendant until after the two year limitation period of the Tort Claims Act. N.J.S.A. 59:8-8(b). We held that while the discovery rule did not apply, there was an equitable tolling of the statute because defendant was a police officer and had an independent duty to disclose the assault.
Plaintiff argues that Dunn is analogous because Fava's conduct toward plaintiff constituted "illegal activity" and that his failure to report his conduct violated his independent duty as chief law enforcement officer of Passaic County. We find the *708 comparison with Dunn to be farfetched. Though perhaps mean-spirited, Fava's conduct was not "illegal activity" in the sense of Dunn.
Plaintiff also contends that he was misled by the misrepresentations of Fava and Nativo that his transfers were "for the good of the Prosecutor's Office", which caused him to delay filing his CEPA complaint. He draws attention to Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380 (3rd Cir.1994), in which the plaintiff, a female attorney in a law firm, was advised that she was dismissed because of insufficient work and subsequently discovered that she was replaced by a male attorney shortly after her departure. The Third Circuit held that plaintiff's allegations were sufficient for equitable tolling of the time period for a claim of discriminatory discharge by sexual discrimination.
[w]e are led to conclude that where a defendant actively misleads the plaintiff regarding the reason for the plaintiff's dismissal, the statute of limitations will not begin to run, that is, will be tolled, until the facts which would support the plaintiff's cause of action, are apparent, or should be apparent to a person with a reasonably prudent regard for his or her rights.
[Oshiver, supra, 38 F.3d at 1389; see also Meyer v. Riegel Prod. Corp., 720 F.2d 303 (1983)(holding that employer misrepresented reasons for discharge in manner to induce plaintiff to fail to file claim for age discrimination raised sufficient fact issue to preclude summary judgment).]
Plaintiff was not discharged, demoted in rank or decreased in salary. He claims injury by transfers to less desirous supervisory positions within the Prosecutor's Office. Assuming this to be the case, a person with a reasonably prudent regard for his rights should have discerned that the transfers were retaliation for his opposition to the prosecutor and an effort to push him into retirement. Equitable tolling affords relief from inflexible, harsh or unfair application of a statute of limitations, but it requires the exercise of reasonable insight and diligence by a person seeking its protection. In this case, plaintiff's inaction and extraordinary delay justified summary judgment dismissing his complaint.
Affirmed.