773 A.2d 718 (2001)
340 N.J. Super. 11
Alexis DANIELS, Plaintiff-Appellant,
v.
The MUTUAL LIFE INSURANCE COMPANY, Richard Connors, Thomas Conklin, Sam Foti, Steven Peloquin, Michael Roth, and Steven Huben, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 2000.
Decided April 24, 2001.
*719 Vincent J. Nuzzi, Fairfield, argued the cause for appellant (Nuzzi, Mason & Cabana, attorneys; Sandra A. Creighton and Lisa Chadwick Thompson, on the briefs).
Rosemary Alito, Newark, argued the cause for respondent (McCarter & English, attorneys; Anthony Palmisano, on the brief).
Before Judges STERN, A. A. RODRIGUEZ and FALL.
The opinion of the court was delivered by RODRIGUEZ, A. A., J.A.D.
Plaintiff Alexis Daniels sued her employer, The Mutual Life Insurance Company (MONY), and several of its upper-management employees, alleging a constructive termination of employment in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. This appeal concerns solely the dismissal of the CEPA claim. The issue presented is whether the one-year statute of limitation set by N.J.S.A. 34:19-5 commences to run on the date Daniels tendered her resignation or on the last day of actual employment. We hold that in a constructive discharge situation, the period of limitations begins to run on the date that the resignation is tendered. This holding is consistent with our opinions in Keelan v. Bell Communications Research, 289 N.J.Super. 531, 540-41, 674 A.2d 603 (App.Div. 1996) (holding that, in an actual discharge situation, the period of limitations runs from the last day of employment), and Holmin v. TRW, Inc., 330 N.J.Super. 30, 46, 748 A.2d 1141 (App.Div.), certif. granted, 165 N.J. 531, 760 A.2d 785 (2000) (holding that, in an actual discharge situation, limitations period for fraudulent inducement cause of action began to run on last day of actual employment rather than on date employee was notified he was to be terminated).

I
Daniels asserts that she was employed by MONY from December 1980 until December 8, 1995. She first worked as Video Manager. In August 1986, she was promoted to Director of Programs and Production, a senior management position. Among her duties, Daniels was responsible for reviewing and approving invoices for expenditures. In June 1994, Daniels became aware that certain senior managers, including the President (Samuel Foti) and two Senior Vice Presidents (Richard Connors and Thomas Conklin), were using an audio visual consultant (Steven Peloquin) retained by MONY to perform personal services. The costs for such services were charged to MONY. Daniels believed that these actions were illegal and/or against public policy. She reported these actions, questioned her superiors as to their propriety, and met with other members of MONY's upper management, including the Chairman of the Board/Chief Executive Officer, Michael Roth.
Daniels alleges that as a direct result of her actions, she was isolated, intimidated, harassed and ostracized by some of her superiors. Her support staff was reduced while her performance demands increased. She was faced with a hostile work environment and perceived that her authority was compromised. According to her, Steven Huben was hired to work in her department without her consent. Daniels alleges that "Huben was hired to intimidate and harass [her] and cause her emotional harm and distress." This inflicted severe anxiety and depression for which she sought therapy. Eventually, these retaliatory actions *720 caused Daniels to tender her oral resignation to Connors on December 4, 1995 effective immediately. Connors' response was to ask "what could be done?" to get her to stay. He implored her to continue working at least until the end of that week because the department was short-handed and important projects were incomplete. Daniels acceded to stay through the end of the week. She submitted a resignation letter dated December 4, 1995, stating that her last work day would be December 8, 1995. She ceased her employment on that day.
On December 9, 1996, one year and four days after the date of her letter of resignation, but one year from her last day of work[1], Daniels filed the present suit against MONY, Connors, Conklin, Foti, Peloquin, Roth and Huben. She alleged that MONY had engaged in retaliatory actions against her, had created a hostile work environment on the basis of her gender and had constructively terminated her. MONY moved for partial summary judgment, seeking to dismiss the CEPA claim because it was time-barred. Daniels opposed the motion, asserting that the complaint had been timely filed within one year of her last day of work.
Judge Daniel Mecca granted MONY's motion and dismissed the CEPA claim. He supplemented his opinion from the bench with a written opinion. Judge Mecca reasoned that Daniels herself "declared that her working conditions had become so intolerable that she was forced to resign." Therefore, he concluded that at the very latest the retaliatory action "had necessarily occurred by the date she tendered her resignation." Because she filed her complaint more than a year from this date, her CEPA claim was time-barred.
Daniels moved for leave to appeal. We denied her application.[2] Thereafter, the parties consented to an order dismissing the remaining two counts in the complaint. This resulted in a final judgment.

II
Daniels now appeals contending that: (1) the trial court erred in its application of Keelan v. Bell Communications Research, 289 N.J.Super. 531, 674 A.2d 603 (App. Div.1996); (2) CEPA is a remedial statute that must be liberally construed and it requires a completed action, i.e. separation from employment; and (3) "the Court should further support the goal of communication in the employment relationship and not penalize the employee who issues notice of resignation with a shorter statute of limitations." In her reply brief, Daniels also contends that she was the subject of a retaliatory action until her last day on the job. We are not persuaded that these contentions require a reversal.
In relevant part, CEPA provides that:
Upon a violation of any provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction.

[N.J.S.A. 34:19-5.]
A cause of action under the statute arises upon the commission of a violation by the employer. In Keelan, supra, we held that:
The definition of retaliatory action speaks in terms of completed action. Discharge, suspension or demotion are final acts. "Retaliatory action" does not encompass action taken to effectuate the "discharge, suspension or demotion." *721 We therefore find no retaliatory action until plaintiff's actual discharge.

[289 N.J.Super. at 539, 674 A.2d 603.]
Thus, an employee's CEPA claim generally accrues on the date of actual termination, not on the date the employee receives notice of the termination. We reasoned that actions taken to effectuate a termination, such as the employer's notification, are not final acts and thus do not trigger the statute of limitations. Ibid. An important factor in our decision was that during the period between notice and actual termination, the "plaintiff had the opportunity either through direct contact with supervisory personnel or by a demonstration of loyalty or excellent work performance to persuade [the employer] that its decision [to terminate the plaintiff] was unwise." Id. at 540, 674 A.2d 603. It is also clear that the employer can rescind the termination decision prior to actual discharge. Therefore, in theory, the employee has not suffered a harm. In short, notice of discharge is not final and thus does not constitute retaliatory action until the day of separation from employment.
Recently, we held in Holmin, supra, 330 N.J.Super. at 32, 748 A.2d 1141 that the six-year statute of limitations governing a claim for fraudulent inducement to leave prior employment began to run when the plaintiff employee actually left his job thirteen days after notice of termination. We based this decision on several policy grounds. First, similar to Keelan, we noted that "until an employee is actually terminated, a `seemingly final decision' may well be reconsidered and perhaps reversed." Id. at 46, 748 A.2d 1141. Second, a "bright line" test would eliminate litigation and "hair-splitting" in determining when an employee knew or should have known that termination was definite. Ibid. Third, "a rule which dates running of the limitation period from the actual termination of a plaintiff's employment conforms with a basic proposition of our law: a cause of action accrues when a plaintiff has been injured or damaged." Ibid.
Here, there was no express termination of Daniels' employment by MONY. Instead, Daniels alleges that there was a constructive discharge. A constructive discharge occurs when the employer has imposed upon an employee working conditions "so intolerable that a reasonable person subject to them would resign." Muench v. Township of Haddon, 255 N.J.Super. 288, 302, 605 A.2d 242 (App.Div.1992). Thus, in a constructive discharge situation, a violation occurs at the point where a reasonable employee is compelled to resign due to the employer's action. At that point, the employer has engaged in a retaliatory action. The employee cannot change the intolerable conditions imposed by the employer by demonstrating loyalty or excellent work performance. The employer cannot rescind a constructive discharge. The harm has been done when the employee feels compelled to resign. In short, in an actual termination situation, the retaliatory action which starts the running of the period of limitations is the separation from work. In a constructive discharge situation, the retaliatory action is the creation of intolerable conditions which a reasonable employee cannot accept. The conditions become intolerable when the employee tenders his or her resignation. Thus, by definition, the act of discrimination cannot occur any later than the date of resignation.

III
Federal and appellate courts in other jurisdictions confronting similar issues have taken a position consistent with the *722 rule we are adopting today. See, e.g., Maluo v. Nakano, 125 F.Supp.2d 1224, 1236 (D.Haw.2000) (holding that under Hawaii law, the period of limitations for a constructive discharge claim begins to run on the date of employee's resignation); Lowell v. Glidden-Durkee, 529 F.Supp. 17, 23 (N.D.Ill.1981) (ruling that limitations period was triggered on the date plaintiff tendered her resignation rather than the resignation's effective date); Hancock v. Bureau of Nat'l Affairs, Inc., 645 A.2d 588, 590 (D.C.1994) (holding that limitations period began at point when plaintiff gave retirement notice because "[a]ny discriminatory act constituting the basis of a constructive discharge claim must have occurred before that date"); Jacobson v. Parda Fed. Credit Union, 457 Mich. 318, 577 N.W.2d 881, 885 (1998) (holding that statute of limitations under Michigan's whistleblower statute commenced on date of resignation); University of Texas Med. Branch v. Hohman, 6 S.W.3d 767, 774 (Tex.Ct.App.1999) (holding that constructive discharge claims accrued on resignation date).
There are no reported decisions that have held that a constructive discharge claim accrues after the employee tenders a resignation. But see Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996). Aman held that even though plaintiff remained at her employment four weeks after conditions were declared to be intolerable, that did not preclude a constructive discharge claim. Id. at 1084. The issue in that case, however, was not when plaintiff's claim accrued, but whether plaintiff had a cause of action.
Daniels also argues that choosing the termination date would establish a brightline rule that would prevent future courts from having to make a factual determination as to when a retaliatory action occurs. However, we agree with MONY's argument that the date on which an employee tenders a resignation following a constructive discharge, is easily discernible and functions equally well as a bright-line test. Moreover, that is the date that the constructive discharge, the completed retaliatory action occurred. Obviously, subsequent conduct by the employer cannot bring about a resignation that has already been tendered.
Accordingly, the partial summary judgment dismissing Daniels' CEPA claim because it was time-barred is affirmed.
NOTES
[1] December 8, 1996 was a Sunday. See R. 1:3-1.
[2] Alexis Daniels v. The Mutual Life Ins. Co., No. AM-1268-97T3 (App.Div. Aug. 13, 1998).