827 A.2d 1173 (2002)
362 N.J. Super. 366
Kathy COKUS Plaintiff
v.
BRISTOL MYERS SQUIBB COMPANY and Dr. Sam Barker Defendant.
Superior Court of New Jersey, Law Division.
Decided April 22, 2002.
*1175 Rosemary Alito, Newark, Esq., Vincent N. Avallone, Esq., McCarter and English, Counsel for Defendant, Bristol Myer Squibb.
Elizabeth Zuckerman, Princeton, Esq., Zuckerman and Fisher, Counsel for Plaintiff, Kathy Cokus.
*1174 SAPP-PETERSON, J.S.C.
This is a motion for summary judgment brought on behalf of defendants, Bristol-Myers Squibb Company ("BMS") and Dr. Sam Barker, who at all relevant times in the complaint was the President of BMS' U.S. Pharmaceutical Group ("USPG"). The action was brought against defendants by plaintiff, Kathy Cokus, an employee of BMS currently on long-term disability. Defendants seek dismissal of the complaint with prejudice contending that, as a matter of law, summary judgment is appropriate, as plaintiff has failed to raise a genuine issue of material fact as to her claims of retaliation under the Conscientious Employee Protection Act ("CEPA") and intentional infliction of emotional distress.
The facts in the case are for the most part undisputed. Nonetheless, since this is a summary judgment motion, in addition to viewing the evidence in a light most favorable to plaintiff, this court also accords *1176 to plaintiff the benefit of all inferences that may be drawn in her favor. R. 4:46-2; Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). Unless the pleadings, depositions, interrogatories, and affidavits raise genuinely disputed issues, the defendants are entitled to summary judgment. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995). Genuinely disputed issues are those having substance as opposed to insignificance. Id. In other words, if plaintiff's opposition consists of disputed issues of fact that are "of an insubstantial nature," the proper disposition is summary judgment. On the other hand, if judicial scrutiny of the record would permit this court to conclude there exists evidence upon which a jury could properly proceed to find a verdict in favor of plaintiff, upon whom the onus of proof is imposed, then this court cannot "shut a deserving litigant from [her] trial." Id. at 540, 666 A.2d 146; Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954).
Plaintiff, prior to her disability leave, was assigned to USPG, Apothecon Division ("Division") as Manager, Pricing Analysis. In that capacity, she managed all bids and contracts for the Division. In 1996, plaintiff became involved in an investigation into questionable business practices within the Division. The investigation apparently stemmed from an anonymous letter written to defendant Barker by plaintiff's close friend and co-employee, Alice Czarnecki. As a result of the letter, a meeting was held on October 30, 1996 in which plaintiff and Czarnecki met with Steve Mahle, another BMS employee, and Mark Durand, Vice President of Finance at USPG, to discuss the issues.
During this meeting, plaintiff and Czarnecki detailed what they believed were fraudulent activities within the Division, including providing names of individuals both within the Division and outside of BMS who allegedly participated in the fraudulent activities. Plaintiff requested anonymity and was assured that any further action "would be totally anonymous".
Following this meeting, Durand contacted BMS' Corporate Security and requested an audit of the Division's records. Plaintiff was interviewed by Corporate Security on November 18, 1996. She provided an overview of everything she knew and indicated to the investigator that if good auditors were retained, more than what she was disclosing would be found.
During this time period, plaintiff's spouse was ill, apparently suffering from AIDS. He shot himself a day before her interview with Corporate Security and subsequently died on November 26, 1996. Other than from field representatives, plaintiff received no expressions of condolences from BMS management or from her co-workers. After her husband's death, plaintiff took two weeks off and did not return to work until December 16, 1996. BMS closed for the holidays from December 25, 1996 until January 2, 1997.
Upon her return to work on January 6, 1997, plaintiff contacted Clyde Rush, Vice President of Human Resources ("HR"), and told him that she felt she was being set up and was worried about how she was being treated. She expressed her fear that she was going to be fired and he told her not to worry"nobody gets fired in this company without me signing it. And [he] wouldn't sign it".
Plaintiff testified at her deposition that during the remainder of January 1997, "it was quite noticeable that everybody walked by [her] office and wouldn't look". Lee Burg, the head of the Division, used to pass her office at least ten times and never once stopped to say anything and if he did he would give her a hateful look, which *1177 plaintiff described as "his teeth were clenched. His nostrils were flared, and that's the only look he made if we made eye contact". In addition, plaintiff testified that Dolly DeMatteo, the secretary she shared with her supervisor Scott Tarriff, and with whom plaintiff had maintained a close friendship for years, told her that Tarriff advised her to simply deliver and pick up mail from plaintiff's office rather than sit and socialize, and that she should limit her interaction with plaintiff. In her deposition, DeMatteo testified that she did not remember whether Tarriff ever told her not to socialize with plaintiff, nor did she remember whether he told her to limit her interaction with plaintiff. She testified that she did remember Tarriff telling her that she was his executive secretary and that she only provided assistance or did work for him and that she did not work for plaintiff.
On February 4, 1997, plaintiff met with Tarriff for what she believed was a scheduled performance partnership meeting. She testified that she brought her year-end objectives and objectives for 1997 to the meeting, but Tarriff threw them to the side, saying they would not be going over them. Plaintiff testified that Tarriff had a look on his face like he would like to kill her. He told her he had a problem with her. He accused her of coming into the office ranting and raving and of having their secretary near tears. He warned her that she "had better stay out of ... things." Plaintiff testified that the meeting ended with Tarriff essentially suggesting that plaintiff find another job, offering to help her in doing so, but also warning her that she "had better straighten out".
After this meeting, plaintiff again met with Clyde Rush. She showed him the performance memorandum that had been left on her chair two days following her meeting with Tarriff. Rush told her the memorandum was meaningless and that she should tear it up. He also told her that Tarriff had been instructed not to do anything. Rush testified that he later reached out to his assistant, Maureen Larkin, to discuss Tarriff and also to discuss getting plaintiff out of the Division because he did not want her subjected to any retaliatory conduct.
Plaintiff was given an opportunity to explore what Rush believed were comparable job opportunities, but plaintiff testified that no actual positions were offered to her. Moreover, she testified that during the ten day period after her meeting with Rush, with virtually no contact from HR, no assurances that Tarriff had been reprimanded for giving her a warning letter, and no indication that Tarriff and/or Burg would be let go, she continued to feel ostracized, threatened and afraid.
She testified that she "needed someone in [the] company to hold onto that [she] felt she could trust, that was saying to [her] daily... I just want you to know everything's okay. How are things going with you? Did anybody do anything today? [She] was an island. [She] was an island with no rowboat."
Plaintiff alleges in her complaint that defendant Barker compromised her anonymity by allegedly showing the anonymous letter or disclosing its existence to Burg, and that she was subjected to retaliatory actions because of her participation in the investigation of the Division. The specific retaliatory acts alleged were "failure to protect plaintiff from hostility and ostracism of her supervisors and/or their deliberate disregard for plaintiff's well being, and/or their failure to protect plaintiff's anonymity, and/or their efforts to drive plaintiff out of the workplace."
Plaintiff also filed a claim for intentional infliction of emotional distress against the defendants based upon the same facts as *1178 those upon which plaintiff relies to support her claim under CEPA. Plaintiff claims that as a result of the defendants' actions she has "been under intensive psychiatric care and has suffered and continues to suffer from severe depression including intermittent suicidal ideation, reclusiveness, paranoia, impaired self-esteem, loss of appetite and anger."
Defendants now move for summary judgment contending that when the facts are viewed in a light most favorable to plaintiff, it is undisputed that: (1) her claims are barred by the statute of limitations; (2) plaintiff has not suffered any adverse employment action arising out of her participation in any whistleblowing activity surrounding the Apothecon investigation; (3) plaintiff waived a common law claim for intentional infliction of emotional distress by the filing of a CEPA claim, and, even in the absence thereof, the underlying facts do not support such a cause of action; (4) plaintiff cannot establish a CEPA claim against Barker; and, (5) that her claim for punitive damages must be dismissed.
Plaintiff, in opposing this motion, contends that she has set forth genuinely disputed issues of fact that: (1) her claims are not barred by the statute of limitations because she filed her claim within one year of her constructive discharge; (2) she suffered an adverse employment action within the meaning of CEPA; (3) the provisions of CEPA do not require waiver of her intentional infliction of emotional distress claim; (4) individual liability may be maintained under CEPA against defendant Barker; (5) the question of punitive damages is one reserved for the trier of fact.[1]
Initially, defendants contend that plaintiff's CEPA claim is barred by the statute of limitations because she failed to file her complaint within one year of the retaliatory conduct as required under the statute. N.J.S.A. 34:19-5 provides that "upon a violation of any of the provisions of [CEPA], an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction."
Plaintiff filed her complaint on February 24, 1998. Defendants contend that she must prove that a violation of the statute took place on or after February 24, 1997. Defendants maintain that the record is devoid of any retaliatory conduct towards plaintiff during this period, therefore, her CEPA claim is time barred. Plaintiff responds that her cause of action accrued on the date that the harassment to which she was subjected caused her constructive discharge.
It is true that between February 24, 1997 and February 27, 1997 (the day plaintiff went on sick leave), she reported no specific acts of ostracism, threatening memos, etc. Nonetheless, plaintiff alleges that part of the retaliatory conduct included the defendant's efforts to drive her out of her position. For that time period, the *1179 record includes conversations between plaintiff and HR personnel about her options. Specifically, while plaintiff was home, she was called by Maureen Larkin, who told plaintiff that she thought they had an understanding that plaintiff would contact her by the close of business the day before as to what she wanted to do. Plaintiff testified that, at that point, she "was about in the middle of a nervous breakdown. I was vomiting on the way to work, crying hysterically, shutting my office door, shaking. I couldn't eat. I had started losing weight. I was paranoid. I thought everybody was against me, because I didn't know who was leaking stuff, and I really didn't even have my wits about me." She went to a doctor on February 27, 1997 and was advised to not make any decisions that would affect her future. When these facts are viewed in a light most favorable to the plaintiff, as the court must do at this posture, her cause of action accrued when the work environment became so intolerable for her that she commenced disability and, in essence, was constructively discharged. Daniels v. Mutual Life Ins. Co., 340 N.J.Super. 11, 773 A.2d 718 (App.Div.2001).
In Daniels, the court distinguished between a termination and constructive discharge for purposes of when a plaintiff's CEPA claim accrues. The court held that in a constructive discharge case, the cause of action accrues at the point where a reasonable employee is compelled to resign due to the employer's action. It is at that point that the employer has engaged in retaliatory conduct. Id. at 18, 773 A.2d 718. Thus, by definition, the act of discrimination cannot occur any later than the date of resignation. Consequently, in the instant matter, plaintiff's cause of action accrued at the earliest, on February 25, 1997, the last day she worked, or at the latest, on February 27, 1997, when she was advised by her physician not to return to work. As such, her CEPA claim is not time barred.
Enacted to protect employees from retaliatory actions by employers, CEPA, commonly known as the "whistle-blower" statute, prohibits employers from taking retaliatory action against employees who: (1) disclose or threaten to disclose an employer's wrongful or illegal activities; (2) testify before a public body regarding an employer's violation of the law; or (3) object to or refuse to participate in an activity which is unlawful or violates public policy. N.J.S.A. 34:19-3. A plaintiff establishes a claim of unlawful retaliation in violation of CEPA with proof that: (1) the employee engaged in whistleblowing activities described under the act; (2) retaliatory action was taken against the employee; and, (3) there was a causal nexus between the plaintiff's whistleblowing activity and the alleged retaliatory or adverse action of the defendants. Young v. Schering Corp., 275 N.J.Super. 221, 645 A.2d 1238, aff'd in part, rev'd in part, 141 N.J. 16, 660 A.2d 1153 (1995).
CEPA is a civil rights statute and is analyzed using the framework for retaliatory discharge claims under Title VII and the New Jersey Law Against Discrimination ("LAD"). Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 650 A.2d 958 (1994); Kolb v. Burns, 320 N.J.Super. 467, 727 A.2d 525 (App.Div. 1999). Therefore, it is appropriate to look to federal law for guidance in interpreting the provisions of the statute. This is particularly true where, as here, there is a dearth of decisions interpreting the specific issue present in this case, namely, whether plaintiff has suffered an "adverse employment action" by virtue of defendants' conduct.
The essence of defendants' defense is that even when the facts are viewed in a *1180 light most favorable to plaintiff, she never suffered an adverse employment action. Consequently, defendants contend that plaintiff fails to establish the second element of a CEPA claim.
It is true that plaintiff experienced no discharge, suspension, demotion, transfer, or loss of income. However, employer actions that fall short of such actions, may nonetheless be the equivalent of an adverse action. See, e.g., Smith v. St. Louis Univ., 109 F.3d 1261 (8th Cir.1997) (finding that negative references to anesthesiologist resident's prospective employers after she complained of sexual harassment by her chair was an adverse action); Charlton v. Paramus Bd. of Educ., 25 F.3d 194 (3rd Cir.1994) (holding that teacher, although no longer employed by the district against which she filed discrimination complaint, could maintain a retaliation claim for district's attempt to revoke her teaching license within the district); Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997) (upholding retaliatory harassment as a form of actionable retaliation under section 1983).
In Anderson, the alleged retaliatory conduct did not involve a tangible adverse employment decision against the plaintiff such as demotion, firing, termination or failure to promote. Id. Plaintiff had filed an EEOC complaint alleging that the employer had engaged in unlawful racial discrimination. The local newspaper published a story that included negative statements about the defendants. Defendants believed that plaintiff was the source of information provided to the press. Defendants commenced an extensive investigation of the plaintiff and his attorney that included photographs, and the institution of a criminal background check. The court reasoned that while the actions directed against plaintiff did not deprive plaintiff of employment, the actions nonetheless denied the plaintiff the "benefit of initiating litigation without the harassment of otherwise uncalled for surveillance, simply because [plaintiff] filed a potentially vexatious lawsuit." Id. at 163.
Although actions short of termination may constitute an adverse employment action within the meaning of the statute, "not everything that makes an employee unhappy is an actionable adverse action." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir.1997). As the Appellate Division observed in Heitzman v. Monmouth County, the LAD was never intended to be a "general civility code" for conduct in the workplace. 321 N.J.Super. 133, 147, 728 A.2d 297 (App.Div.1999).
Thus, in Sunkett v. Misci, 183 F.Supp.2d 691 (D.N.J.2002), African-American city attorneys brought an action against the City of Camden, its Mayor and other officials, alleging violations of their First Amendment rights and discrimination and retaliation in violation of Title VII and CEPA. Defendants moved for summary judgment. The District Court granted partial summary judgment noting that plaintiff Lisa Roberts-Taylor's claim that she had been put "on the outs" with the heads of the City Attorney's Office in retaliation for her objections to illegal contracts, was not a sufficiently "adverse" act to be actionable under CEPA. Id. at 716.
However, a contrary result was reached in Shepherd v. Hunterdon Developmental Center, 336 N.J.Super. 395, 765 A.2d 217 (App.Div.2001) There, plaintiffs brought actions against the defendants alleging that they were subject to a hostile work environment and retaliation in violation of the LAD because they testified against defendants in connection with a discrimination lawsuit filed by co-workers. The Appellate Division held that generally, harassment alone is not an adverse employment *1181 action. Id. (citing Zamboni v. Stamler, 847 F.2d 73 (3d Cir.1988)). The court recognized that there may be situations when retaliatory harassment may amount to an adverse employment action, but found that a supervisor's decision to no longer socialize with an employee or be cordial would not alone constitute an adverse action which altered the conditions of employment so as to be actionable under the LAD. Id. at 419, 765 A.2d 217. The court contemplated that such situations would arise when a defendant's harassing conduct created such an intolerable situation that a plaintiff was forced to transfer. Id. The court instructed trial courts to "consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances." Id. at 420, 765 A.2d 217.
Considering these factors, the court held that the trial court erred in granting summary judgment as to plaintiff Saylor. The court found that when the evidence was viewed from Saylor's perspective, his employer discriminated against him over a four month period under circumstances involving a close physical working relationship between Saylor and his harassers making his working conditions intolerable to the point that he pursued internal grievances, which Saylor alleged, were half-heartedly addressed, ultimately causing him to take early retirement. The court reasoned that whether the decision to take early retirement constituted a constructive discharge was a question of fact for the jury.[2]Id.
It is, therefore, against the analytical framework outlined in Shepherd that the plaintiff's claims are analyzed in the present matter. At the outset, her claims may be grouped into four areas:
(1) Defendants' failure to protect her anonymity after she met with BMS officials to discuss her concerns about the Apothecon Division;
(2) Defendants' failure to protect her from hostility and ostracism by her co-workers and superiors;
(3) Defendants' deliberate disregard for her well being after she initially reported her fears, which were later confirmed by the negative performance evaluation she received from her supervisor; and,
(4) Defendants' failure to engage in meaningful actions to either remove her from the hostile environment, remove her harassers, or to provide her with daily updates on the progress of their investigation.
The Court will discuss each circumstance separately.

PLAINTIFF'S ANONYMITY
Plaintiff testified that when she met with Mark Durand and Steve Mahle, she told them that she had to be promised anonymity because she was like the *1182 "quote/unquote, straight person at Apothecon, and [she] would be the first person that would be suspected of anybody telling... [she] made it clear that, even an [anonymous] letter, they would assume that [she] would have done it. There was no one else at Apothecon that would have done that." She later testified that prior to meeting with Corporate Security, she discussed the matter with Alice Czarnecki, her friend and co-worker who actually wrote the anonymous letter. In addition, after she met with Corporate Security, she also spoke to Vince Balinski, a former Vice President of Sales within Apothecon. According to plaintiff, Balinski had been pressured to leave that position and the anonymous letter was written right after his departure. Plaintiff testified that she was concerned that people might also think that he wrote the letter and there would be repercussions for him. Additionally, plaintiff testified that she discussed the anonymous letter with her secretary, Dolly DeMatteo, because DeMatteo told her that "everyone knew [she] wrote an anonymous letter."
Despite assurances from Durand that her name would never be mentioned, plaintiff believes that defendants disclosed that she wrote the anonymous letter. She reached this conclusion from the manner in which her superiors and co-workers treated her. However, given the fact that plaintiff testified that she would have been the prime suspectexcept for Balinski because of her "straight" personality, it is just as likely that suspicions about her being the author had more to do with plaintiff's personality rather than a breach of any promise by defendants to maintain her anonymity. While it may be argued that this is a fact question for the jury to resolve, plaintiff presents no evidence, direct or otherwise, that defendants compromised her identity. Moreover, plaintiff herself disclosed the fact of the anonymous letter to Balinski and DeMatteo. She offers no evidence from which the trier of fact could rule out their possible disclosure of plaintiff's involvement in the matter. The mere allegation that defendants compromised her identity resulting in the creation of a hostile work environment which became so intolerable that plaintiff was forced to take disability leave, without factual support in the record, is not enough to survive summary judgment. Brae Asset Fund, L.P. v. Newman, 327 N.J.Super. 129, 742 A.2d 986 (App.Div.1999) (citing United States Pipe & Foundry Co. v. American Arbitration Ass'n, 67 N.J.Super. 384, 399-400, 170 A.2d 505 (App.Div. 1961)).

HOSTILITY AND OSTRACISM FROM CO-WORKERS AND SUPERVISORS
Similar to the Shepherd case, the retaliatory conduct in question spanned approximately four months. However, other than the fact that she received no expressions of condolences following her husband's death in November, plaintiff can point to no specific acts of retaliation that occurred prior to her return to work on January 6, 1997. Clearly, the failure to express condolences is not an adverse action within the meaning of CEPA. Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir.2000).
Upon her return, plaintiff testified that she immediately commenced to experience hostility and ostracism from her superiors and co-workers. From her perspective, the atmosphere, which previously had been cordial, had turned hostile. What plaintiff specifically described as hostile was the fact that no one talked to her other than for work-related purposes, Lee Burg glared at her and started coming in early as if he was spying on her, and her perception *1183 that people were talking about her behind closed doors.
The fact that her co-workers and superiors chose to limit their contact with her to business only and otherwise ignored her, stared/glared at her when they walked by her, and, even as plaintiff believed talked about her behind closed doors, neither creates a hostile environment nor adverse action under CEPA. Shepherd, supra, 174 N.J. at 25-28, 803 A.2d 611. To reiterate, employment discrimination laws are "not intended to be a `general civility' code for conduct in the workplace." Heitzman, 321 N.J.Super. at 147, 728 A.2d 297.

SCOTT TARRIFF AND THE NEGATIVE PERFORMANCE EVALUATION
It is undisputed that plaintiff, upon her return to work in January 1997 believed that her job was in jeopardy and went to HR to discuss her concerns. It is also undisputed that Rush assured her that her job was not in jeopardy. He also told her she could not get fired unless HR signed off, which he wouldn't do. Nonetheless, when she met with her supervisor, Scott Tarriff, in early February to discuss what she thought was the year end performance objectives and future objectives, she was criticized, told to stay out of things and that she had better straighten out. Tarriff suggested that she find another job and also offered to help her to do so. Two days later, plaintiff received a performance partnership memorandum from Tarriff, criticizing her attitude, questioning her commitment to the Division and warning her that he expected to see an improvement on her part by the end of March 1997. Plaintiff testified that in twenty years of employment, she had never received such an evaluation. She immediately went to HR and showed the memo to Rush.
The record reveals that Rush again assured plaintiff that nothing was going to happen to her. He believed it would also be a good idea for plaintiff to get out of the Apothecon Division and plaintiff agreed to explore other options. When plaintiff expressed her feeling that she should not have to move because she had not done anything wrong, plaintiff testified that Rush asked her to hold on because he believed that both Tarriff and Burg would soon be gone, but he also asked her to meet with other division heads to see what was available. Rush kept the original performance partnership memo.
There is no evidence that the memo was ever made part of her personnel file. Plaintiff was never terminated, transferred, or had her salary reduced as a result of Tarriff's memo. In fact, in the days following her second meeting with Rush, plaintiff made entries into her diary that Tarriff was civil to heralthough plaintiff did not believe that his gestures were sincere. Other than the fact that Tarriff was not immediately terminated, plaintiff neither testified nor presented any evidence of harassing behavior directed towards her by Tarriff after she received his memo.
There can be no doubt that plaintiff, prior to the commencement of the investigation, enjoyed a close working relationship with the secretary whom she shared with Tarriff, and that he attempted to interfere with that relationship and the relationships plaintiff had with other co-workers. Moreover, for purposes of this motion, it is reasonable to infer that Tarriff gave plaintiff a negative performance appraisal because he believed that plaintiff instigated the investigation. The question, however, is whether the cumulative effect of these incidents amounts to an adverse action under CEPA.
*1184 Defendants attempt to minimize these events by arguing that no one testified that Tarriff instructed DeMatteo to limit the work she was doing but only not to sit and socialize with plaintiff, a request which defendants contend DeMatteo apparently ignored. Defendants also argue that the only reasonable inference to be drawn from Tarriff's statement that he would help plaintiff find another job was, as defendants would have this court conclude, a benevolent desire to help plaintiff find another position. The defendants further argue that even if this statement was a veiled threat to get rid of her, plaintiff knew what the corporate policy was for discharge so this statement was essentially meaningless. Defendants also contend that Tarriff's so-called warnings were no more than oral reprimands which, as a matter of law, do not constitute an adverse employment decision. Finally, defendants note that plaintiff was never fired, transferred, demoted or suffered any other adverse action as a result of the performance evaluation.
Defendants rely upon two federal decisions decided under Title VII to support their contentions, Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir.1997) and Munday v. Waste Management of North America, Inc., 126 F.3d 239 (4th Cir.1997). In Munday, plaintiff and defendants settled a sexual harassment and sexual discrimination complaint before the Maryland Office of Human Rights. Part of the settlement included an agreement not to retaliate against plaintiff for filing the complaint. Upon her return to work plaintiff observed that co-workers refused to talk to her. She learned that the employees had been specifically instructed to ignore her and to report to the general manager anything plaintiff said to other employees. She was also told that the general manager wanted to get rid of her. Plaintiff was placed on disability leave following panic attacks and eventually resigned. She subsequently filed an action in federal court alleging sexual harassment and sexual discrimination. The trial court, sitting without a jury, held that the defendant, through the general manager, had retaliated against her for filing a complaint with the Maryland Office of Human Rights. 858 F.Supp. 1364 (D.Md.1994). On appeal, the Fourth Circuit found as a matter of law that the defendants' conduct did not amount to an adverse employment action under Title VII and also rejected the district court's finding that plaintiff had been constructively discharged by virtue of the defendants' actions. Munday, supra, 126 F.3d at 243.
The court observed that the district court noted that throughout the plaintiff's tenure at Waste Management, she had to cope with being ignored both by her top supervisor and her co-workers. The court further pointed out that she never complained about being ignored, there was no evidence that any co-worker actually spied on her or reported plaintiff's statements to the general manager, and her complaints were investigated and addressed where appropriate. Id. at 244. Additionally, the court found that plaintiff's employment status had not been altered, pointing out that there was no evidence that she had ever received a reprimand in her record or an unsatisfactory evaluation. Id. Finally, the court rejected plaintiff's claim that she had been constructively discharged by pointing out that plaintiff did not actually resign her employment until some seventeen months after the events that formed the basis of her action, "thus objectively belying her assertion that she was forced to resign from her employment with Waste Management." Id.
In Robinson, one of plaintiff's claims alleged that after she filed a discrimination complaint with the EEOC she suffered *1185 reprisals at work which included oral reprimands and derogatory comments. 120 F.3d at 1293. The court held that such conduct does not rise to the level of an adverse employment action because the conduct alleged was not serious and tangible enough to alter the terms and conditions of the plaintiff's employment. Id. at 1305.
In the present matter, because the gravamen of plaintiff's complaint alleges that defendants, in retaliation for her whistleblowing activities, created a hostile work environment so intolerable that it altered the conditions of employment to the point that defendants' actions constituted an adverse employment action, it is appropriate to consider whether her claim is actionable under the standard articulated in Lehmann v. Toys `R' Us, 132 N.J. 587, 626 A.2d 445 (1993).
Although Lehmann dealt with sexual harassment, its standard has been extended to other forms of hostile work environment claims and represents "the basic standard for determining whether acts of harassment in the workplace constitute invidious discrimination in violation of the [law]." Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998) (analyzing hostile work environment based on race under Lehmann standard); Leonard v. Metropolitan Life Ins. Co., 318 N.J.Super. 337, 723 A.2d 1007 (App.Div.1999) (applying Lehmann standard to hostile work environment claim based upon handicap).
Accordingly, to sustain a claim of hostile work environment based upon an employee engaging in whistleblowing activities under CEPA, a plaintiff must establish that the conduct complained of would not have occurred but for his or her whistleblowing activities, and that it was severe or pervasive enough to make a reasonable person in the employee's shoes believe that the conditions of employment had been altered and the working environment had become hostile and abusive to the point that the conduct in question is the equivalent of an adverse action. Shepherd, supra, 336 N.J.Super. at 419, 765 A.2d 217 (citing Breaux v. City of Garland, 205 F.3d 150, 160 (5th Cir.) cert. denied, 531 U.S. 816, 121 S.Ct. 52, 148 L.Ed.2d 21 (2000); see also Ditzel v. Univ. of Med. & Dentistry of New Jersey, 962 F.Supp. 595, 603 (D.N.J.1997) (applying the Lehmann criteria to plaintiff's claim of hostile work environment based on handicap harassment).
There can be no doubt that Tarriff attempted to alter the conditions of plaintiff's employment by interfering with the plaintiff's relationship with their shared secretary and most notably by issuing a negative performance partnership evaluation. There is also no question that plaintiff and Tarriff worked closely together. In addition to sharing the same secretary, they also apparently worked in close physical proximity to each other. Moreover, as her direct supervisor, it is evident that he had the power and attempted to assert his authority over her by accusing her of upsetting their secretary, issuing the reprimand, and implicitly threatening her with termination by broaching the subject of other employment.
Notwithstanding Tarriff's admonitions, there is no evidence in the record that DeMatteo changed her relationship with the plaintiff. In fact, the record discloses that they not only continued to talk, but that DeMatteo kept her abreast of the office talk surrounding the audit and investigation. The record is replete with instances when DeMatteo reported to plaintiff on how Tarriff was reacting to the investigation.
Next, there is nothing in the record to indicate that Tarriff's memo became part of plaintiff's personnel file. The original *1186 was given to Rush, who told plaintiff "not to worry about it," and plaintiff presents no further evidence that in any way suggests that this document became part of her official record. Thus, it must be treated as withdrawn or rescinded as a matter of law. Kadetsky v. Egg Harbor Twp. Bd. of Ed., 82 F.Supp.2d 327, 340 (D.N.J.2000) (dismissing plaintiff's CEPA claim because the alleged adverse actions were reversed or remedied by the employer and there was no lasting prejudice).
Moreover, plaintiff was never fired, demoted or transferred. Indeed, when she voiced an objection to being transferred from a job that she "loved and had done well for twenty years," Rush asked her to "hold on" suggesting to her that Tarriff and Burg would be gone shortly. Finally, after receiving the negative performance evaluation, plaintiff experienced no further harassment. Plaintiff made an entry into her diary that Tarriff was being civil towards her. Although she testified that she did not believe that Tarriff's civility was sincere, the fact remains that there were no further incidents of harassment from Tarriff. Thus, while Tarriff's specific conduct over a three day period was inexcusable, neither under Lehmann nor Shepherd could any reasonable person conclude that his conduct was sufficiently severe or pervasive so as to have altered the conditions of plaintiff's employment to the point that it constituted an adverse employment action.

DEFENDANTS FAILURE TO ENGAGE IN MEANINGFUL ACTIONS TO EITHER REMOVE PLAINTIFF FROM THE HOSTILE ENVIRONMENT, REMOVE PLAINTIFF'S HARASSERS, OR TO PROVIDE PLAINTIFF WITH DAILY UPDATES ON THE PROGRESS OF THEIR INVESTIGATION
It is undisputed that the decision to try to move plaintiff out of the Division was that of Clyde Rush. In his deposition testimony, he testified that he wanted to get plaintiff out of the environment because he didn't want any semblance of retaliation. Plaintiff offers no evidence that Rush's motivation was otherwise. She testified that she explained to him that she really did not want to leave her position, that she had done nothing wrong and she just wanted things straightened out. She testified that he then asked her to "just meet with Jack [O'Leary] and see what was available." She also testified that he told her "from what he understood from Sam [defendant Sam Barker, the President of USPG, Apothecon], just sit and do your job because he understood they would probably be gone within a few weeks." Plaintiff acknowledged in her testimony that it wasn't definite that she would end up moving. Plaintiff met with Jack O'Leary and persons under his supervision over the next several days following her meeting with Rush on February 7, 1997. She did not find any of the proposed job opportunities interesting, particularly since some would involve a reduction in title or displacement of another employee. During this time period, she spoke with Maureen Larkin on more than one occasion with regard to the status of her job inquiries in other divisions. Plaintiff's diary notes contact with Larkin on February 20, 26 and 27, 1997.
As predicted by Rush, Burg was in fact terminated less than a month after plaintiff went on short-term disability, and Tarriff was discharged several months later. Further, plaintiff testified that Rush told her Larkin was instructed to direct Tarriff to cease his retaliatory conduct towards plaintiff. Thereafter, plaintiff noted that Tarriff was being civil towards her. Thus, it is reasonable to infer that Larkin admonished Tarriff as she had been directed to do.
*1187 Analyzing these facts in a light most favorable to plaintiff, under the framework articulated in Shepherd, does not create a genuinely disputed issue of fact sufficient to defeat summary judgment. Shepherd, supra, 336 N.J.Super. at 419-420, 765 A.2d 217. When plaintiff reported her concerns to HR, she received immediate assurances that she had no need to fear that her job was in jeopardy. Following the meeting with Tarriff and the receipt of his memorandum, plaintiff was reassured that her job was not in jeopardy, and she was present when Rush directed Larkin to straighten out the problem and to make sure that Tarriff did not harass the plaintiff. She made contemporaneous entries in her diary that Tarriff was being civil to her, and although she agreed to explore other job opportunities, she also acknowledged that it was not definite that she would move, and she acknowledged that she was told to sit tight because Tarriff and Burg would more than likely be gone shortly. It is true that plaintiff did not get daily reports on what was being done for her or daily reports on the status of the investigation. This, however, does not constitute an adverse action. Indeed, it is well settled that the business judgments of an employer are not the subject of judicial scrutiny, so long as those judgments are not discriminatorily motivated. Maiorino v. Schering-Plough Corp., 302 N.J.Super. 323, 345, 695 A.2d 353 (App.Div.1997) (citing Walker v. AT & T Techs., 995 F.2d 846, 850 (8th Cir.1993)).
In summary, with the exception of the conduct of Tarriff, none of the other alleged acts of retaliation constitute a material change in conditions of employment actionable under CEPA. With respect to Tarriff, while his conduct was clearly retaliatory, it ultimately did not result in any adverse action, nor were the specific incidents attributed to him sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner. Consequently, the defendants are entitled to summary judgment dismissing plaintiff's CEPA claim.
Similarly, plaintiff's claim for intentional infliction of emotional distress must also be dismissed because the underlying facts alleged in support of this claim are the exact same facts that form the basis of her CEPA claim. N.J.S.A. 34:19-8 provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law."
All of the facts that plaintiff asserts in connection with her claim for intentional infliction of emotional distress arise out of plaintiff's whistleblowing activities from which the resulting retaliation allegedly followed. Hence, the waiver provision of CEPA applies to this claim. Young v. Schering Corp., 275 N.J.Super. 221, 645 A.2d 1238 (App.Div.1994), aff'd, 141 N.J. 16, 660 A.2d 1153 (1995).
Moreover, even if the conduct in question was not in retaliation for plaintiff's whistleblowing activities, no reasonable trier of fact could conclude under Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 544 A.2d 857 (1988) that the actions of the defendants were so extreme and outrageous as to be actionable. See also 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 547 A.2d 1134 (App.Div.1988). Clearly the workplace environment became annoying and emotionally oppressive to plaintiff. However, the extreme and outrageous conduct contemplated under Buckley does not extend to indignities, threats, annoyances, petty oppressions, or other trivialities. 49 Prospect St. Tenants Ass'n, supra, 227 *1188 N.J.Super. at 471-472, 547 A.2d 1134 (citing Restatement (Second) Torts § 46).
Plaintiff also seeks to hold defendant Barker individually liable under CEPA. Defendants contend that, as a matter of law, individual liability may not be imposed under CEPA. Plaintiff, relying upon Palladino ex. rel. U.S. v. VNA of Southern New Jersey, 68 F.Supp.2d 455 (D.N.J.1999) argues that the statute does contemplate individual liability. The question of whether CEPA permits individual liability need not be addressed, however, because the facts supporting such a claim do not establish any retaliatory action by defendant Barker.
There is no evidence in the record that Barker engaged in any retaliatory conduct towards plaintiff. His culpable conduct involved showing the anonymous letter to Lee Burg, the President of Apothecon. He testified that he believed it was appropriate to show the letter to the head of the division in light of the fact that there was going to be an audit and investigation. In addition, CEPA does not dictate to an employer the manner in which an investigation into illegal activity must be taken. Plaintiff argues that the consequences of Burg's showing the letter to Tarriff and others resulted in widespread harassment, humiliation, ostracism and hate towards her. Once again, having already determined that the harassment, ostracism and hate plaintiff experienced do not satisfy the standards articulated under Lehmann and do not constitute adverse employment actions, no individual liability may be sustained against Barker under CEPA.
Finally, in light of the court's ruling with regard to plaintiff's underlying claims, her additional claim for punitive damages must also be dismissed.
NOTES
[1] Plaintiff also raises the issue that Tarriff, without her permission, disclosed that her husband had AIDS, and scrutinized her expense vouchers more than others. This claim was not alleged in the Complaint and was only raised during discovery when plaintiff testified that the discussions about her husband's illness occurred sometime in 1996, but she did not have personal knowledge of these discussions. Additionally, plaintiff's claim regarding disparate treatment as to the expense vouchers was never pled. Moreover, any issue about the expense vouchers arose prior to the anonymous letter being sent. Plaintiff's allegations in opposition to this motion that contradict her deposition testimony cannot be used to defeat summary judgment. Shelcusky v. Garjulio, 343 N.J.Super. 504, 778 A.2d 1176 (App.Div.2001), rev'd, 172 N.J. 185, 797 A.2d 138 (2002); Mosior v. Ins. Co. of North America, 193 N.J.Super. 190, 473 A.2d 86 (App.Div. 1984).
[2] Subsequent to this court's decision, the Supreme Court affirmed in part and reversed in part the Appellate Division's decision in Shepherd. The Court found that although summary judgment should not have been granted in connection with plaintiffs' claims of hostile work environment, it disagreed with the Appellate Division's finding that there were genuinely disputed issues of fact as to whether plaintiff Saylor was constructively discharged. The Court concluded that it was not convinced on the record before it that defendants' conduct was so unbearable that it forced Saylor's early retirement. Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 803 A.2d 611 (2002) Nonetheless, the Court cited, with approval, the Appellate Division's specific considerations relevant to a constructive discharge analysis. Id. at 28, 803 A.2d 611.