**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2855-23

LADAWN CHAPMAN,

    Plaintiff-Appellant,

v.

ALARIS HEALTH, LLC
and ALARIS HEALTH AT
HAMILTON PARK,

    Defendants-Respondents.

_____

        Argued September 16, 2025 – Decided September 29, 2025

        Before Judges Gilson and Firko.

        On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1583-20.

        William C. Matsikoudis argued the cause for appellant (Matsikoudis & Fanciullo, LLC, attorneys; William C. Matsikoudis, on the briefs).

        David F. Jasinski argued the cause for respondents (Jasinski, PC, attorneys; David F. Jasinski, of counsel and on the brief; Jennifer C. Van Syckle and Erin L. Henderson, on the brief).

PER CURIAM

In this employment matter, plaintiff Ladawn Chapman appeals from an April 26, 2024 order denying her motion for a new trial. A jury determined that defendants Alaris Health, LLC and Alaris Health at Hamilton Park (collectively Alaris or defendants) did not discharge plaintiff, a former employee, in violation of public policy and did not violate the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. We affirm.

I.

Factual Background

We summarize the material facts from the record. Defendants operate nursing facilities. Plaintiff worked at an Alaris nursing home for eighteen years as a certified nursing assistant (CNA). Among her duties were to bathe, feed, clean, transfer, and communicate with Alaris's residents to ensure their concerns and needs were expressed to healthcare providers. Plaintiff was also responsible for providing post-mortem care to deceased residents' bodies for the coroner. In her final year of employment, she became a part-time employee so she could care for her elderly mother and focus on her jewelry business.

2

In early March 2020, plaintiff heard about the COVID-19[1] outbreak. Alaris took several precautions related to COVID-19, including suspending visitations and providing hand-washing training. Alaris claims that the first confirmed COVID-19 case was discovered at the facility where plaintiff worked on March 27, 2020. However, plaintiff suspected that residents had contracted COVID-19 as early as March 22, 2020, as she observed some of her residents exhibited COVID-19 symptoms including coughing, fever, diarrhea, and an "increased amount in deaths that [she'd] never seen before." Plaintiff reported her concerns to her supervisor, Mary Carmona, but was told that no one had COVID-19, just the flu.[2] On March 25, 2020, plaintiff noticed a growing number of staff were out sick.

---

[1] COVID-19 is an infectious disease caused by the SARS-CoV-2 virus. Most people infected with the virus will experience mild to moderate respiratory illness and recover without requiring special treatment. However, some will become seriously ill and require medical attention. Older people and those with underlying medical conditions like cardiovascular disease, diabetes, chronic respiratory disease, or cancer are more likely to develop serious illness. World Health Organization, Coronavirus Disease (COVID-19) (last visited Sept. 23, 2025), https://www.who.int/health-topics/coronavirus

[2] There was an unidentified nurse who asked about the number of confirmed COVID-19 cases in a WhatsApp chat, with Carla Samson, an Assistant Director of Nurses at Alaris, advising there were no confirmed cases.

A-2855-23

During this time, Alaris had policies in place where staff, including plaintiff, were not permitted to wear personal protective equipment (PPE) masks during their shifts because they were following guidance from the Centers for Disease Control (CDC)[3] on COVID-19. On March 25, 2020, Alaris sent correspondence to all staff members notifying them that "each employee will be issued a mask during check-in at the beginning of every shift."[4] However, towards the end of March 2020, Alaris implemented a universal masking policy, where staff "can wear . . . mask[s] [at] any time anywhere."[5]

Plaintiff was working at Alaris on March 15, 18, 22, 25, and April 1, 2020. On her last day, April 1, 2020, plaintiff was caring for one of her patients[6] with

---

[3] Samson testified that there was no guidance from the CDC that healthcare workers were required to wear masks.

[4] Defendants' counsel read from Samson's deposition, which is not included in this record. Samson testified that "[i]n March 2020, masks were not required to be worn if the patient wasn't showing [COVID-19] symptoms and then we did a universal mask."

[5] However, plaintiff testified, at trial, "masks were not distributed to staff . . . to wear" during their shifts and "[Alaris] did not allow staff to wear masks, even if they brought their own masks" because wearing them would "scare" the residents.

[6] This patient is referred to as "Mr. X" in the transcript to preserve his confidentiality.

A-2855-23

whom she had a close relationship and hugged him upon entering the room. However, "Mr. X" told plaintiff not to hug him because he caught COVID-19 from his roommate. Co-workers later informed plaintiff that Mr. X died from COVID-19 complications. Plaintiff also discovered that one of her co-workers, with whom she worked in close proximity while neither was wearing a mask, tested positive for COVID-19. Plaintiff was concerned that she may have contracted COVID-19 from being exposed to unmasked individuals at Alaris. On April 1 and 2, 2020, plaintiff was informed by fellow Alaris employees that they had tested positive for COVID-19.

On April 2, 2020, plaintiff attended a regularly scheduled appointment with her primary care physician, Dr. Saquiba Syed. The doctor provided plaintiff with a note advising her to self-quarantine until April 16, 2020, even though plaintiff was asymptomatic, to prevent her from potentially infecting her mother, co-workers, and residents, and until plaintiff received COVID-19 test results. Dr. Syed faxed the note to Alaris.

In response to Dr. Syed's note, Alaris's Director of Nursing, Nancy LaBattaglia, sent plaintiff a text message requesting she call her because the note was unacceptable and indicated that she would have to "accept [plaintiff's] official resignation." Plaintiff called LaBattaglia regarding the text message and

A-2855-23

told her why she needed to self-quarantine. However, LaBattaglia testified that plaintiff "was fearful of exposing her mother" and "never mentioned anything about an exposure." When plaintiff was asked by LaBattaglia, "what [are] you gonna do?" plaintiff responded she was going to follow Dr. Syed's advice. According to plaintiff, LaBattaglia then informed her that she was "no longer an employee[.]" Plaintiff advised LaBattaglia she would not sign any resignation papers because she was "self-isolating" and not resigning.

Plaintiff called Katrina Wilkins, Alaris's Human Resources (HR) staffing coordinator, to confirm that she was fired. Plaintiff claims Wilkins confirmed that she was fired. Plaintiff then called her union representatives and complained to them about her employment situation at Alaris. Thereafter, plaintiff participated in conference calls with former coworkers and "town hall" type meetings. According to plaintiff, other Alaris employees shared similar complaints about a lack of PPE and multiple deaths at Alaris. Plaintiff learned that she had been removed from Alaris's staff text group.

On April 15, 2020, plaintiff attended a telehealth visit with Dr. Syed and informed the doctor that she was being threatened to leave her job. Dr. Syed's office notes from that visit indicate plaintiff complained of anxiety disorder, "unrealistic worry," experienced "sweating, chest pain, palpitations, unusually

6

A-2855-23

strong or irregular heartbeats," and a "choking" feeling. Plaintiff stated her anxiety had worsened after plaintiff was questioned by her supervisor about being out of work. Dr. Syed faxed another note to Alaris to excuse plaintiff from work until May 16, 2020, due to "medical incapacity" as result of her anxiety. Dr. Syed prescribed anxiety medication—Lexapro—due to plaintiff's statement that her anxiety had worsened.

On April 17, 2024, Derek Froiran, Alaris's business manager, received Dr. Syed's note and sent an email to plaintiff stating:

> We are in receipt of a physician's note for you dated [April 16, 2020], indicating that you were advised not to work for the next four weeks due to "medical incapacity." Due to the requirement . . . for the facility to submit information regarding staff members who may be exhibiting signs or symptoms of COVID-19, we . . . need to know more specific details about your medical condition.

Plaintiff did not respond to Froiran's email. On April 22, 2020, plaintiff filed her initial complaint against Alaris alleging discharge in violation of public policy (count one) and CEPA violations (count two). Plaintiff sought back pay, front pay, compensatory damages for emotional distress, consequential

A-2855-23

damages, punitive damages, and attorney's fees.  The following day, plaintiff exchanged text messages[7] with Wilkins as follows:

> PLAINTIFF: "I'm busy at the moment. Please text me."
>
> (Wilkins calls and leaves a message.)
>
> WILKINS:  "Hey.  Just seeing . . . how's everything?  And I wanted to talk with you.  Please call me when you get a chance."
>
> PLAINTIFF:  "Talk to me . . . I said talk [to] me about what?"
>
> WILKINS:  "Your note and something else.  I'm getting a hint that you don't want to talk to me."
>
> PLAINTIFF:  "Should I?"
>
> WILKINS:  "I would think so.  I mean, I'm not sure what your issue is with me right now, but the he said/she said is really out of hand at this point.  I thought we were always okay."
>
> PLAINTIFF:  "We good.  I just don't understand what this call could be about.  Even regarding the note, you told me she said I was done.  So there's nothing to talk about.". . .  "And I still haven't received a resignation acceptance letter.  Any update on that?"
>
> WILKINS: "Look, woman. Call me."

Plaintiff did not call Wilkins back.

---

[7]  These text messages are not included in the record.  They were read during the trial and admitted into evidence.

A-2855-23

On April 27, 2020, Alaris's Administrator, Yosef Wulliger, sent correspondence to plaintiff, which stated,

> We anticipated your return back to work on April 17[], but received [an] additional note extending your absence with an anticipated return to work on May 16[.] You remain an active employee on our staff roster and the facility has immediate CNA position work ready for your return to help care for our residents.
>
> I hope that this letter clarifies any misperceptions that you may have made. We anticipate your return back to work on May 16.

Plaintiff received the letter and testified that Alaris was "trying to cover themselves" because she had filed the lawsuit. Plaintiff acknowledged the letter stated that she was able to return to her employment as a CNA at Alaris on May 16, 2020, but never did.

On May 4, 2020, plaintiff was evaluated again by Dr. Syed who noted plaintiff "was severely anxious and cannot function due to watching people die and [seeing] many dead bodies and feels that she has [post-traumatic stress disorder (PTSD)] at this time." Dr. Syed advised plaintiff to consult with a psychiatrist for PTSD and anxiety.

On June 30, 2020, plaintiff filed a first amended complaint, the operative pleading here, alleging the same two causes of action. Plaintiff alleged in the first count that defendants violated her common law protection against discharge

9

in violation of public policy by terminating her "despite her doctor's note recommending two weeks of self-quarantine" due to plaintiff's "likely exposure to COVID-19 to protect herself, her mother, and Alaris patients" from COVID-19 infection.

In the second count of the amended complaint, plaintiff alleged that defendants violated CEPA by retaliating against her for: (1) self-quarantining and declining to report to work despite Dr. Syed's recommendation; (2) expressing her concerns to LaBattaglia who "demanded" plaintiff report to work even if she tested positive for COVID-19; (3) objecting to and refusing to follow LaBattaglia's orders to report to work despite the fact plaintiff had been exposed to COVID-19 and was advised to self-quarantine, which plaintiff "reasonably believed constituted improper quality of patient care," in violation of N.J.S.A. 34:19-3(c)(1); and (4) for reporting LaBattaglia's demands and "her resistance to them" to HR representatives. Plaintiff alleged defendants' actions violated the Family and Medical Leave Act (FMLA), U.S.C. § 2601, and the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020). Plaintiff sought the same relief as in the original complaint.

Following discovery, defendants moved for summary judgment arguing plaintiff remained an active employee as a CNA, and her anticipated date to

return to work was May 16, 2020. Defendants argued there was no genuine issue of material fact because Wulliger's correspondence "eradicate[d]" any alleged prior termination by LaBattaglia even if it was found to have occurred. Plaintiff opposed the motion arguing she was "terminated" and that an "offer of re-employment" in the face of a wrongful discharge claim can only "potentially mitigate" her damages. Defendants' motion for summary judgment was denied on the basis a genuine issue of material fact was presented as to whether plaintiff was terminated. Defendants moved for reconsideration, which was denied.

Subsequently, defendants filed a second motion for summary judgment limited to the issue of whether a clear mandate of public policy was articulated and whether plaintiff's termination had been rescinded. The motion court denied the motion finding a "completed termination of employment cannot be rescinded," and a genuine issue of material fact existed as to whether plaintiff "reasonably believed that her employment was terminated."

At trial, plaintiff testified about her reasons for not returning back to work at Alaris:

> Two reasons. One being that I was a dedicated employee for [eighteen] years and I couldn't believe how they treated me when I was simply trying to follow my doctor's orders and maintain proper care for the residents and not spread anything to my coworkers nor the residents that I was attending to.

Secondly, knowing that they had PPE but they refused to give it to us because they didn't want to scare the residents, as they said to me directly with the masks in particular, I feel like a lot of these sicknesses and deaths could have been prevented if it was treated with such care like it was supposed to.

I complained to supervisors. I complained to the union. I did not keep this to myself. I did everything that I was supposed to do. All I wanted to do was just quarantine to keep everybody safe.

On cross-examination, plaintiff was asked if she would have stayed at Alaris if LaBattaglia had accepted Dr. Syed's April 2, 2020 note and allowed her to quarantine from COVID-19 for two weeks. Plaintiff answered in the affirmative and said,

I loved what I did. I'm a caregiver at heart. So it just[—]I worked there for almost two decades. That should describe it in itself. I literally loved everyone. I loved the coworker[s]. I loved the staff. I was—I was just completely devastated with how the outcome happened to be, but if she would have accepted that, I definitely would have been there to care for the residents because they needed people like me there to care for them.

LaBattaglia, who was no longer employed by defendants at the time she testified at trial, explained plaintiff did not "mention that she had any symptoms" and only spoke about her mother's exposure to COVID-19. LaBattaglia testified she "did not" fire plaintiff and that plaintiff did not "resign" from her position.

12

Plaintiff also presented testimony from an economist regarding the issue of economic losses. The economist testified that plaintiff's official termination date was July 9, 2020, based on a ledger she reviewed. Alaris's Assistant Director of Nursing, Carmona, testified about COVID-19 cases at Alaris and defendants' COVID-19 policies. When questioned about a conversation she had with plaintiff about her wearing a mask, Carmona testified "[t]hat is . . . contrary to my belief in safeguarding everyone's well[-]being." Dr. Syed's video deposition was played for the jury. Sampson testified she would "never lie" about COVID-19 cases in the facility.

Plaintiff's initial proposed jury charges asserted "defendants terminated her employment" and that she "was fired on April 3, 2020, for refusing to report to work after being exposed to multiple [COVID-19] positive people for extended periods of time" when neither she nor the COVID-19 positive individuals were wearing masks. Plaintiff alleged it would have been unlawful for her to report to work under CEPA. As to the second element of her claim based on defendants' retaliatory action, plaintiff's requested jury charge asserted she "was terminated."

Several days later, plaintiff re-submitted her proposed jury charge, this time asserting she was "constructively discharged—that is, she left her job

13

because the conditions [d]efendants created at the nursing home where [she] worked were so intolerable that a reasonable person would be forced to resign rather than continue to endure them." Defendants countered the evidence did not demonstrate constructive discharge, and it was not pled in the first amended complaint.

At the charge conference, the trial court denied plaintiff's request to charge constructive discharge. The trial court reasoned that to establish a prima facie case of constructive discharge, a plaintiff must establish defendants knowingly permitted conditions that were "so intolerable that a reasonable person would be forced to resign rather than continue to endure it[,]" citing Kluczyk v. Tropicana Products, Inc., 368 N.J. Super. 479, 493 (App. Div. 2004) (quoting Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002)) (citing Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)). The trial court noted the constructive discharge standard envisions a "sense of outrageous, coercive, and unconscionable requirements" and "more [than] egregious conduct than that sufficient for a hostile work environment claim" under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -50. Ibid.

14

Defendants moved for a directed verdict on the grounds plaintiff was given an unconditional offer of reinstatement. The trial court denied the motion to allow the jury to determine whether plaintiff had mitigated her damages. The jury found that defendants did not terminate plaintiff's employment and returned a no cause verdict.

Plaintiff filed a motion for a new trial arguing that the trial court erred by not charging constructive discharge because sufficient evidence was presented for the jury to determine she was constructively discharged under CEPA. Defendants opposed the motion arguing there was insufficient evidence to establish constructive discharge. Defendants also asserted the trial court applied the correct standard and that plaintiff was judicially estopped from making a constructive discharge claim.

In a memorandum of decision, the trial court denied plaintiff's motion for a new trial. The trial court held the amended complaint failed to allege "sufficient information" on the constructive discharge issue to "satisfy notice" to defendants. The trial court highlighted plaintiff did not allege she was "constructively discharged" as there was no "utterance of 'constructive discharge' or 'intolerable working conditions.'" In addition, the trial court found there was no evidence on which a jury could conclude plaintiff resigned because:

(1) plaintiff testified she was "fired" on April 3, 2020; (2) plaintiff stated "she was not resigning" but following her doctor's orders to quarantine for two weeks; and (3) plaintiff failed to establish the conditions were so horrible that she was resigning instead of returning to work. A memorializing order was entered. This appeal followed.

Plaintiff presents the following arguments for our consideration:

> (1) the trial court erred by not charging the jury on constructive discharge, which amounted to a directed verdict and was based upon an inapplicable legal standard;

> (2) The trial court erred in denying plaintiff's motion for a new trial on different grounds than its decision to not charge the jury on constructive discharge because the evidence at trial warranted that plaintiff be afforded this avenue of relief and the bases relied on by the trial court in denying a new trial arose out of a misreading of the law and an inappropriate strict construction of CEPA; and

> (3) adding the law of constructive discharge and allowing the jury to consider this claim would not have been prejudicial because all issues relevant to the claim were already front and center in the case.

## II.

"A jury verdict is entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and

16

weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597 (1977)). A trial court should grant a motion for new trial after "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Ibid. (quoting R. 4:49-1(a)).

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge . . . ." Liberty Ins. Corp. v. Techdan, LLC, 253 N.J. 87, 103 (2023) (quoting Risko, 206 N.J. at 522). "Thus, to determine whether the [plaintiff] is entitled to a new trial based on the record before us, we consider whether denying a new trial 'would result in a miscarriage of justice shocking to the conscience of the court.'" Twp. of Manalapan v. Gentile, 242 N.J. 295, 305 (2020) (citations omitted).

> A miscarriage of justice has been described as a pervading sense of wrongness needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-valuation of crucial evidence, [or] a clearly unjust result[.]
>
> [Risko, 206 N.J. at 521 (citations omitted).]

17

"However, in deciding [a motion for new trial], an appellate court must give 'due deference' to the trial court's 'feel of the case.'" Id. at 522 (citations omitted). Our Supreme Court explained:

> the test is 'essentially the same' because where certain aspects are important—witness credibility, 'demeanor,' 'feel of the case,' or other criteria which are not transmitted by the written record—the appellate court must give deference to the views of the trial judge thereon. [The] decision, however, is not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which . . . is no more peculiarly situated to decide than the appellate court.
>
> [Conrad v. Robbi, 341 N.J. Super. 424, 443 (App. Div. 2001) (quoting Dolson v. Anastasia, 55 N.J. 2, 7 (1969)).]

Plaintiff first asserts that the trial court erred by not charging the jury on constructive discharge. According to plaintiff, the evidence at trial adequately established intolerable working conditions at Alaris justifying her to resign, including: (1) Alaris's prohibition on staff wearing masks for most of March 2020 to prevent residents from getting scared; (2) Alaris's "misrepresentations" to staff regarding suspected and confirmed COVID-19 cases; (3) LaBattaglia's April 3, 2020 text message to plaintiff in response to Dr. Syed's note directing plaintiff to self-quarantine and stating the note was not acceptable, indicating

18

LaBattaglia would have to accept plaintiff's resignation; and (4) plaintiff's interactions with her labor union and co-workers subsequent to April 3, 2020, during which she heard similar complaints about the conditions at Alais, such as failure to provide staff with PPE, and learning about the sickness and deaths of residents and co-workers. We address each of plaintiff's contentions in turn.

CEPA

CEPA was enacted "to provide 'broad protections against employer retaliat[ion]' for workers whose whistle-blowing actions benefit the health, safety and welfare of the public." Carmona v. Resorts Int'l Hotel, 189 N.J. 354, 371 (2007) (quoting Feldman v. Hunterdon Radiological Assocs., 187 N.J. 228, 239 (2006)). Its purpose is "to protect whistle[-]blowers from retaliation by employers." Lippman v. Ethicon, Inc., 222 N.J. 362, 378 (2015) (citing Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). Consistent with that purpose, CEPA "is considered remedial legislation entitled to liberal construction." Ibid.

A plaintiff establishing a prima facie claim for retaliation under CEPA must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a

19

"whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Id. at 380 (citations omitted).]

Plaintiff's CEPA retaliation claim is based on N.J.S.A. 34:19-3(c), which bars an employer from taking any retaliatory action against an employee when the employee objects to, or refuses to participate in any activity, policy, or practice and reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

A-2855-23

[N.J.S.A. 34:19-3(c). See also Allen v. Cape May Cnty., 246 N.J. 275, 290 (2021) (quoting N.J.S.A. 34:19-3(c)).]

When a plaintiff establishes a prima facie claim under CEPA, the burden of persuasion shifts to the defendant-employer "to rebut the presumption of discrimination by articulating some legitimate nondiscriminatory reason for the adverse employment action." Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999) (citing Anderson v. Exxon Co., U.S.A., 89 N.J. 483 (1982)); see also Allen, 246 N.J. at 290-91. If the employer meets that burden, the plaintiff then must prove the employer's asserted legitimate reasons were pretextual and not the real reasons for the employer's discriminatory acts. Allen, 246 N.J. at 291.

<u>Constructive Discharge</u>

At issue here is whether the jury should have been instructed on constructive discharge. Plaintiff contends the trial court erred by relying on the NJLAD standard for constructive discharge, citing to Kluczyk, instead of the CEPA standard for constructive discharge. Defendants counter that our standard of review is not whether the trial court erred, but whether it abused its discretion by not allowing plaintiff to amend her pleadings to raise a constructive discharge claim so the claim could be charged to the jury.

21

Under CEPA, a "'[r]etaliatory action' is defined as 'the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.'" Donelson v. DuPont Chambers Works, 206 N.J. 243, 257 (2011) (quoting N.J.S.A. 34:19-2(e)). However, "[w]hat constitutes an 'adverse employment action' must be viewed in light of the broad remedial purpose of CEPA." Ibid. Our Supreme Court has held that, for purposes of a CEPA violation, "[a] discharge encompasses not just an actual termination from an employment, but a constructive discharge." Ibid.

Under the NJLAD, constructive discharge "occurs when an 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Shepherd, 174 N.J. at 27-28 (quoting Muench v. Twp. of Haddon, 255 N.J. Super. 288, 302 (App. Div. 1992)). By comparison, a constructive discharge under CEPA "occurs when the employer has imposed upon an employee working conditions 'so intolerable that a reasonable person subject to them would resign'" rather than continue to endure it. Donelson, 206 N.J. at 257; Daniels v. Mut. Life Ins. Co., 340 N.J. Super. 11, 17 (App. Div. 2001) (quoting Muench, 255 N.J. Super. at 302). While NJLAD applies a different standard for constructive discharge than CEPA,

22

"[t]he same analytical framework [for an NJLAD claim] applies to a CEPA claim[.]" Zubrycky v. ASA Apple, Inc., 381 N.J. Super. 162, 166 (App. Div. 2005).

"In a constructive discharge situation, the retaliatory action is the creation of intolerable conditions which a reasonable employee cannot accept." Daniels, 340 N.J. Super. at 17-18. "The phrase 'intolerable conditions' conveys a sense of outrageous, coercive and unconscionable requirements." Jones, 339 N.J. Super. at 428. However, "not every employment action that makes an employee unhappy constitutes 'an actionable adverse action.'" Richter v. Oakland Bd. of Educ., 459 N.J. Super. 400, 418 (App. Div. 2019) (citing Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 434 (App. Div. 2005)) (quoting Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 378 (App. Div. 2002)).

Moreover, "[f]or purposes of . . . retaliatory discharge, an employee is expected to take all reasonable steps necessary to remain employed." Zubrycky, 381 N.J. Super. at 166 (citing Shepherd, 174 N.J. at 28). "Constructive discharge is a 'heavily fact-driven determination[.]'" Muench, 255 N.J. Super. at 302. In making that determination, courts will consider all circumstances, including the nature of the employer's conduct. Shepherd, 174 N.J. at 28.

Guided by these legal principles, we conclude the trial court correctly denied plaintiff's request to amend her pleadings to add constructive discharge and properly did not charge the jury on constructive discharge. Contrary to plaintiff's argument, a proposed amendment to the first amended complaint to add constructive discharge did not conform to the evidence presented at trial by plaintiff. Rather, the uncontroverted evidence showed that on April 2, 2020, Dr. Syed sent defendants a note stating plaintiff should quarantine for fourteen days because she may have been exposed to COVID-19. The next day, LaBattaglia sent plaintiff a text message stating the note was unacceptable, and if plaintiff did not call her, LaBattaglia would have to accept plaintiff's official resignation. The trial court determined plaintiff testified she called LaBattaglia and told her that she was "not resigning but would be following her own doctor's orders and quarantining."

The next day, the uncontroverted evidence showed plaintiff confirmed she was fired by another Alaris supervisor, and she sought unemployment compensation. Plaintiff also advised Dr. Syed she had been fired and notified her union representative that she was wrongfully terminated. On April 27, 2020, defendants sent plaintiff correspondence stating she was still an active employee and could return to work.

24

The trial court emphasized plaintiff testified "more than [twenty-five] times that she was fired, . . . she did not quit, and she did not resign." Based on the evidence presented at the trial, we are convinced the trial court did not abuse its discretion in denying plaintiff's request to amend her pleadings under Rule 4:9-2 to include constructive discharge and in not charging the jury on this theory.

Moreover, the record shows that plaintiff's cause of action litigated pre-trial and during trial was premised on wrongful termination, and not constructive discharge. For example, plaintiff maintained during the trial that she was "fired" as of April 3, 2020. Plaintiff never argued she was abandoning her employment. Given these proofs, the trial court properly found that defendants would have been prejudiced if a constructive discharge claim was interjected into the case at the close of the evidence because defendants were deprived of an opportunity to defend against such a claim.

### III.

Next, we address plaintiff's argument that the trial court erred in denying her motion for a new trial. Plaintiff contends she was: (1) not required to plead constructive discharge in her first amended complaint in order to request a constructive discharge jury instruction; and (2) the trial court erroneously held

constructive discharge was inapplicable. In addition, citing to Rule 4:5-7[8] and

Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 76 (1990), plaintiff avers she

sufficiently stated a case under CEPA and was not required to plead every fact

or theory that she might rely on at trial to prove her case.

The moving party is entitled to a new trial only if it establishes that "there

was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373,

386 (2018) (quoting Risko, 206 N.J. at 522 (internal quotation marks omitted)).

A miscarriage of justice occurs when "there is a 'manifest lack of inherently

credible evidence to support the finding,' when there has been an 'obvious

overlooking or under-valuation of crucial evidence,' or when the case culminates

in 'a clearly unjust result.'" Id. at 386-87 (quoting Risko, 206 N.J. at 521-22).

This same standard governs our review on appeal. Risko, 206 N.J. at 522.

As noted in the trial court's memorandum of decision, plaintiff's initial

complaint alleges "she was wrongfully terminated and . . . did not resign," and

her initial and first amended complaint did not allege either constructive

discharge or intolerable working conditions. Although the first amended

---

[8] Rule 4:5-7 states, [e]ach allegation of a pleading shall be simple, concise and direct, and no technical forms of pleading are required. All pleadings shall be liberally construed in the interest of justice. Pressler & Verniero, Current N.J. Court Rules, (2026).

complaint mentions "including but not limited to terminating," there are no allegations of constructive discharge or intolerable working conditions. Moreover, as pointed out by the trial court, the "only reference to resignation in the [first amended] complaint is [p]laintiff's insistence that 'she was not resigning,'" but would be following her doctor's orders and quarantining.

We also reject plaintiff's contention that a jury could have determined that she was justified in resigning on April 3, 2020, when LaBattaglia notified her that she could not accept Dr. Syed's note. There was no jury question as to whether plaintiff was constructively discharged because she consistently and unequivocally testified she was fired.

Froiran testified that he was not instructed or asked to prepare any paperwork regarding plaintiff's resignation and would not have sent the April 17, 2020 email to her if she had been terminated or had resigned as of April 3, 2020. Further, Dr. Syed only testified about plaintiff's visits, the doctor's note, and her diagnosis. Dr. Syed offered no testimony or opinions correlating plaintiff's mental health conditions with working conditions at Alaris. In sum, the proofs were insufficient for a jury to conclude that a constructive discharge occurred.

IV.

Finally, we address plaintiff's argument that adding the law of constructive discharge at trial would not have been prejudicial to defendants. Plaintiff contends every legal and factual issue regarding constructive discharge was part of the case and litigated. Plaintiff reiterates that her assertion she was fired does not stop her from raising a constructive discharge claim.

Defendants counter that plaintiff could not present a new theory during trial, which is "at variance" with pretrial discovery and evidence presented at trial, citing Lynch v. Galler Seven-Up Pre-Mix Corp., 74 N.J. 146, 151 (1977). Defendants point out they would have been prejudiced if plaintiff added constructive discharge as a theory in the case "last minute" in light of the numerous opportunities to amend the pleadings pre-trial. Defendants also argue that the jury could not have concluded that plaintiff would have been justified in resigning on April 27, 2020, because such a finding would have been inconsistent with prior motion practice and the questions on the verdict sheet. We agree because those points are supported by the record.

As noted in Donelson, "[a] discharge encompasses not just an actual termination from an employment, but a constructive discharge." 206 N.J. at 257. "But the universe of possible retaliatory actions under CEPA is greater than

discharge, suspension, and demotion; it includes 'other adverse employment action taken against an employee in the terms and conditions of employment.'" Ibid. (citing N.J.S.A. 34:19-2(e)). Plaintiff alleged she was wrongfully terminated as the basis of her CEPA claim and never alleged that she was constructively discharged from employment. It was not until the last day of testimony at the charge conference that plaintiff requested to include constructive discharge as part of the jury charges. As the trial court observed:

> Plaintiff . . . offered no evidence on which a jury could conclude she resigned. Throughout the trial, the only assertion by [p]laintiff was that she was fired on April 3. It was not until the testimony was complete, during the charge conference, that the notion of constructive discharge was raised for the first time. If anything, including such a charge would have been a miscarriage of justice for the defense who were not on notice and did not have a proper opportunity to question witnesses about, or defend against[] it. . . . .

We find no basis to comment on the other claims raised by plaintiff in light of the facts of this case. R. 2:11-3(e)(1)(E). Accordingly, the judgment is affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hawley

Clerk of the Appellate Division

29